1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  FRANCES T. GRUNDER
   Senior Assistant Attorney General
4  MICHAEL W. JORGENSON
   Supervising Deputy Attorney General
5  EMILY L. BRINKMAN, State Bar No. 219400
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5742
    Fax: (415) 703-5843
8   Email: Emily.Brinkman@doj.ca.gov
   Attorneys for  U. J. Cooper and Robert A. Horel
9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

| | |
|---|---|
| 14  **ERNEST S. HARRIS,** | C 06-7761 MJJ (PR) |
| 15                      Plaintiff, | **DECLARATION OF C. PATTEN IN SUPPORT OF** |
| 16      v. | **DEFENDANTS' MOTION TO DISMISS AND MOTION FOR** |
| 17  **ROBERT A. HOREL, et al,** | **SUMMARY JUDGMENT** |
| 18 | |
| 19                      Defendants. | |

20  I, C. Patten, declare as follows:

21      1.    I am employed by the California Department of Corrections and Rehabilitation

22  (CDCR) and have been so employed since 1986.  Currently, I am the Captain of the Madrid

23  Compliance Unit at Pelican Bay State Prison (Pelican Bay).

24      2.    I have personal knowledge of the matters in this Declaration and if called upon as a

25  witness would and could so competently testify.  I submit this Declaration in support of

26  Defendants' Motion to Dismiss and Motion for Summary Judgment.

27      3.    The Madrid Compliance Unit is responsible for monitoring and auditing several class

28  action lawsuits and the corrective action plans and/or remedial plans that govern them, which

Decl. Patten Supp. Mot. Summ. J.                                    *Harris v. Horel et al*
                                                                    C 06-7761 MJJ (PR)

1    include *Freitag v. California Department of Corrections*, 468 F.3d 528 (9th Cir. 2006), N.D. Cal.

2    Case No. C00-2278 TEH. *Freitag* specifically involves the management of habitual indecent

3    exposure inmate offenders.

4        4.    Following the issuance of an injunction in *Freitag*, on April 21, 2003 I was assigned to

5    began writing the Corrective Action Plan (CAP) to address the management of indecent exposure

6    incidents at Pelican Bay. Attached as Exhibit A is a true and accurate copy of the Injunction for

7    the Court's convenience. On May 14, 2003, I submitted the first formal draft of the

8    "Management of Habitual Inmate Indecent Exposure Control Plan." I then drafted the Policy,

9    Lesson Plan, Operational Procedure (OP) number 233, and Pilot Project used to implement the

10   CAP. I was also assigned to establish a training team and then train all Pelican Bay staff on the

11   new CAP. Attached as Exhibits B, C, and D are true and accurate copies of the Pilot Project, OP

12   233, and Lesson Plan.

13       5.    The injunction and monitoring for indecent exposure of inmates was assigned to the

14   Special Master in *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), Case No. C90-3094

15   TEH. All indecent exposure plans were submitted to the *Madrid* Special Master for monitoring.

16   This process included meetings under the direction of the Special Master, John Hagar, and

17   involved the Prison Law Office, the Attorney General's Office, the attorneys from *Freitag*,

18   CDCR Legal, Pelican Bay's Warden, and members of clinical and custodial staff. Attached as

19   Exhibit E is a true and accurate copy of the Order Adopting the Special Master's Report and

20   Recommendation Regarding Inmate Exhibitionist Masturbation.

21       6.    Following the issuance of the permanent injunction, CDCR began implementing

22   policies and procedure at Pelican Bay to remedy incident of indecent exposure. CAPS was

23   implemented starting approximately July 15, 2003, particularly the security precautions. The

24   Pilot Program began March 1, 2005 and CDCR provided notice to the inmates on October 5,

25   2004. Attached as Exhibit F is a true and accurate copy of the notice to inmates. Per Penal Code

26   section 5058.1, the Pilot Program was in place from March 1, 2005 through March 1, 2007.

27       7.    The Pilot Program continues to be followed at Pelican Bay following official changes

28   to the Department Operational Manual, Chapter 5, Article 25, Section 52100.1 through 52100.7.

Decl. Patten Supp. Mot. Summ. J.

*Harris v. Horel et al*
C 06-7761 MJJ (PR)

1  Departmental Regulations, California Code of Regulations title 15, sections 3000, 3007, 3177,

2  3323, and 3341.5, have been created and implemented as a result of the Pelican Bay Pilot

3  Program for the Management of Indecent Exposure Incidents. Pelican Bay continues to manage

4  incidents of inmate indecent exposure or sexual disorderly conduct consistent with the injunction

5  and the primary elements reflected in the Pilot Program.

6      8.    There are five primary elements to the Pelican Bay Pilot Program for the Management

7  of Indecent Exposure Incidents;

8          a.    Training: All correctional staff are required to take a two hour training course on

9              the Management of Inmate Indecent Exposure and Sexual Disorderly Conduct. This

10             class is provided on a monthly basis at Pelican Bay Employee Orientation.

11         b.    Disciplinary Component: Sanctions include can include a term in the Secured

12             Housing Unit (SHU), loss of canteen, loss of property, annual or quarterly package

13             loss, appliance restrictions, and visiting restrictions. Incident and disciplinary reporting

14             requirements include mandatory reporting for all correctional staff. The Reporting

15             Employee is then provided with immediate support from the institution and advised of

16             access to further support and/or tools available to respond to the indecent exposure or

17             sexual disorderly conduct. Referrals to the District Attorney and/or prosecutions are

18             consistent with a Memorandum of Understanding with the local District

19             Attorney's Office.

20         c.    Security Precautions: These include a bright yellow placard or Lexan cell covering

21             attached to the front of the cell to alert staff of an inmate's propensity to commit acts

22             of indecent exposure or sexual disorderly conduct. Also used is an exposure control

23             jumpsuit that prevents an inmate from exposing himself. This suit is mandatory for

24             inmates who commit acts of indecent exposure or sexual disorderly conduct out of

25             their cell. Any inmate who is assigned to an Exposure Control Jumpsuit is required to

26             be under direct supervision and only wears the suit when the inmate is being escorted

27             to and from his cell or is participating in out of cell activities. The inmate is not

28             required to wear this suit while in his cell. These precautions are consistently reviewed

Decl. Patten Supp. Mot. Summ. J.

*Harris v. Horel et al*
C 06-7761 MJJ (PR)

3

1    and removed once the inmate has been in compliance with the regulations relating to

2    indecent exposure for a designated period of time.

3        d.    Mental Health Component: Inmates that offend as a result of a mental disorder

4    known as exhibitionism or paraphilia are provided the opportunity to participate in

5    treatment and voluntarily participate in group therapy.  Although exhibitionism is not

6    one of the mental illnesses identified as requiring mandatory treatment or threat to

7    self or the safety of others, treatment is offered to those diagnosed with exhibitionism

8    in order to provide another means of reducing indecent exposure incidents and to

9    create a better working and living environment for staff and inmates.

10       e.    Administrative review: All indecent exposure and sexual disorderly conduct

11   incidents are reviewed by the Indecent Exposure Review Committee monthly to ensure

12   that policies and procedures are followed as well as to review correctional staff's ideas

13   and concerns.  This committee also identifies any trends and measures the program's

14   impact.

15       9.    The disciplinary sanctions vary depending upon the number of prior incidents.  A first

16   offense might result in the loss of the following privileges for up to 90 days: a) canteen; b)

17   appliances (radios, television, cd player); c) annual/quarterly packages; d) telephone privileges;

18   and e) loss of personal property.  A second offense can result in the loss of the previously stated

19   privileges for up to 180 days.  An inmate convicted of a violation of Penal Code section 314,

20   indecent exposure, or section 647(a), sexual disorderly conduct, could also face the possibility of

21   losing family visitations.  Violations of this nature can also subject an inmate to placement within

22   the SHU for a determinate period of time which is referred and reviewed by the Institutional

23   Classification Committee chaired by the Warden or his designee.

24       10.   In an effort to protect staff and other inmates from being exposed to incidents of

25   indecent exposure, the Pilot Program and OP 233 identified the following security precautions,

26   which can be imposed temporarily or on an extended basis with weekly review by the appropriate

27   authority:

28       a.    temporary yard restriction;

Decl. Patten Supp. Mot. Summ. J.

*Harris v. Horel et al*
C 06-7761 MJJ (PR)

4

1        b.    use of behavior modification suit (Attached as Exhibit G is a true and accurate

2        representation of a behavioral modification suit);

3        c.    bright yellow placard or Lexan (depending upon the cell front type) used to alert

4        staff of inmates who have a propensity to commit acts of indecent exposure or sexual

5        disorderly conduct.  The color yellow was chosen because it is the universal sign for

6        warning.  (Attached as Exhibit H is a true and accurate representation of one type of

7        Lexan cell front covering); and

8        d.    substitute concrete yard for regular yard.

9  These precautions vary depending upon where the inmate is housed (General Population,

10  Administrative Segregation, or Psychiatric Services Unit for example), where the offense occurs

11  (in cell, in showers, in group therapy session for example), and whether the conduct is habitual.

12  These precautions are done primarily to warn staff of the inmate's indecent exposure behavior.

13     I declare under penalty of perjury that the foregoing is true and correct.  Executed at

14  Crescent City, California, on October ___5___, 2007.

15

16

17            Captain C. Patten
               Madrid Compliance Unit

18

19

20

21

22

23

24

25

26

27

28

Decl. Patten Supp. Mot. Summ. J.

*Harris v. Horel et al*
C 06-7761 MJJ (PR)

# EXHIBIT A

FILED
2003 AUG 18 PM 2:25
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NR. DIST OF CA.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEANNA FREITAG,

                Plaintiff,

      v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS, et al.,

                Defendants.

NO. C00-2278 TEH

ORDER GRANTING IN
PART AND DENYING IN
PART PLAINTIFF'S MOTION
TO AMEND JUDGMENT TO
INCLUDE PERMANENT
INJUNCTIVE RELIEF

This matter came before the Court on August 11, 2003, on Plaintiff's Motion to Amend Judgment to Include Permanent Injunctive Relief. After careful consideration of the parties' written briefs and oral arguments, and good cause appearing, the Court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for the reasons set forth below.

## I. FACTUAL BACKGROUND

This case arises out of Plaintiff Deanna Freitag's employment as a correctional officer at Pelican Bay State Prison ("Pelican Bay") from January 1, 1996, until her dismissal on June 23, 2000. Plaintiff's allegations focus primarily on her assignment to the Security Housing Unit ("SHU"), where she claims she was exposed to exhibitionist masturbation by a number of the SHU inmates. Plaintiff complained, both orally and in writing, to Pelican Bay administrators and other state officials about the failure of her supervisors to take reasonable steps to eliminate or reduce the frequency of the inmates' sexual misconduct. In her subsequent civil action, Plaintiff alleged that this failure to respond to her complaints resulted in the creation and maintenance of a sexually hostile work environment. Plaintiff further alleged that, because of her complaints about the inmates' conduct, various adverse

1  employment actions were taken against her, the most serious of which was her ultimate

2  termination.

3      On March 4, 2003, Plaintiff proceeded to trial on three causes of action: (1) a claim

4  of hostile work environment in violation of Title VII of the Civil Rights Act of 1964 against

5  the California Department of Corrections ("CDC"); (2) a claim of retaliation in violation of

6  Title VII against CDC; and (3) a claim under 42 U.S.C. § 1983 for retaliation in violation of

7  her First Amendment right to free speech against Warden Robert Ayers, Jr., Associate

8  Warden Teresa Schwartz, Investigative Services Unit Captain Paul Dillard, SHU Captain

9  Barry O'Neill, SHU Lieutenant David Carmichael, SHU Sergeant Glen Rodman, Equal

10  Employment Opportunity Coordinator Augustin Lopez, and Employment Relations Officer

11  George Neotti.  On April 2, 2003, the jury returned a verdict finding CDC liable for both

12  hostile work environment and retaliation under Title VII.  The jury further found Ayers,

13  Schwartz, and Lopez liable under section 1983 for retaliation in violation of Plaintiff's First

14  Amendment rights.  Plaintiff was awarded $500,000 in economic damages and $100,000 in

15  non-economic damages against all four defendants.  Additionally, Plaintiff was awarded

16  punitive damages in the amount of $100 each against Ayers, Schwartz, and Lopez.  Judgment

17  was entered to that effect on May 5, 2003.

18

19  II.  LEGAL STANDARD

20      Section 706(g) of Title VII of the Civil Rights Act of 1964 provides that if a district

21  court finds that a defendant "has intentionally engaged in or is intentionally engaging in an

22  unlawful employment practice charged in the complaint, the court may enjoin the [defendant]

23  from engaging in such unlawful employment practice, and order such affirmative action as

24  may be appropriate." 42 U.S.C. § 2000e-5(g)(1) (2003).  Title VII bestows on district courts

25  broad equitable powers to fashion remedial orders to redress the effects of past violations.

26  Bouman v. Block, 940 F.2d 1211, 1233 (9th Cir. 1991); see EEOC v. Ilona of Hungary, Inc.,

27  108 F.3d 1569, 1578 (7th Cir. 1997) (explaining that Title VII grants district courts wide

28

United States District Court
For the Northern District of California

2

discretion to enjoin proven acts of employment discrimination). Under Title VII, injunctive relief is appropriate once the court has determined that the defendant has engaged in an unlawful employment practice. 42 U.S.C. § 2000e-5(g)(1). The Act does not require that a pattern or practice of discrimination be shown, or that evidence of discrimination going beyond the plaintiff's case be presented, as a prerequisite to a district court's exercise of its remedial powers. Ilona of Hungary, 108 F.3d at 1578.

In the Ninth Circuit, "victims of employment discrimination generally are entitled to an injunction against future discrimination, unless the employer proves it is unlikely to repeat the practice." EEOC v. Hacienda Hotel, 881 F.2d 1504, 1519 (9th Cir. 1989), citing EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539, 1544 (9th Cir. 1987). Courts in other circuits have similarly concluded that equitable relief is available to a successful Title VII plaintiff unless the defendant can make a strong showing that such a remedy is unnecessary. See James v. Stockham Valves & Fittings Co., 559 F.2d 310, 354 (5th Cir. 1977) (holding that injunctive relief is mandatory "absent clear and convincing proof of no reasonable probability of further noncompliance with the law").

It is well-established that "[a]n employer that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction." Goodyear Aerospace, 813 F.2d at 1544; see Guzman v. Oxnard Lemon Associates, Ltd., 1992 U.S. Dist. LEXIS 20642, at *17-18 (C.D. Cal. 1992) (finding that "the mere fact that the defendant has taken some curative steps does not render injunctive relief inappropriate," as the defendant's actions "do not establish that there is no reasonable expectation that the alleged [discrimination] will recur") (internal quotations and citation omitted). Furthermore, a district court's authority to issue an injunction survives the cessation of the unlawful practices sought to be enjoined, as courts have an obligation to eliminate the present effects of past discrimination even in the absence of the threat of future illegal behavior. NAACP v. City of Evergreen, 693 F.2d 1367, 1370 (11th Cir. 1982). At bottom, when determining whether it is appropriate to enter a remedial order, the court must

United State( istrict Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1 ask whether the discriminatory conduct complained of can possibly persist in the future.

2 Ilona of Hungary, 108 F.3d at 1578-79.

3      Title VII is remedial legislation that should be liberally construed in favor of victims

4 of unlawful employment practices. Moyo v. Gomez, 40 F.3d 982, 985 (9th Cir. 1994); see

5 Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir. 1969) (noting that Title VII's

6 grant of remedial authority should be interpreted broadly and applied in such a way that

7 effectively eradicates the illegal conduct and makes the victim whole). A district court's

8 decision to grant or deny an injunction is reviewed for an abuse of discretion and the

9 application of correct legal principles. Hacienda Hotel, 881 F.2d at 1519.

10

11 **III. DISCUSSION**

12 **A. Plaintiff's Entitlement to Injunctive Relief**

13      Plaintiff urges the Court to issue a permanent injunction against CDC, which she

14 believes is necessary to ensure that she and other similarly situated female employees are not

15 harmed by the sexual harassment and retaliation for which the jury found CDC liable.

16 Plaintiff, who is currently seeking reinstatement to the position of correctional officer

17 through the administrative appeal she has filed with the California State Personnel Board,

18 argues that a remedial order is necessary to protect her from future harm during this process.

19 She further contends that absent equitable relief, she will once again be subject to CDC's

20 unlawful retaliatory practices and to a hostile work environment upon renewing her

21 employment with the agency.

22      CDC takes exception to Plaintiff's request for an injunction on several grounds. First,

23 CDC objects to what it characterizes as Plaintiff's attempt to obtain relief on behalf of all

24 female officers employed at the 33 correctional institutions in the California prison system.

25 Because the evidence introduced at trial focused exclusively on the experiences of Plaintiff

26 and other female staff members at Pelican Bay, the Court does not have the authority to issue

27 a remedial order that extends beyond this single prison. As CDC observes, the Court has

28

1   been presented with no evidence even suggesting that the problems about which Plaintiff

2   complains in this action exist at other institutions, and therefore it would certainly exceed its

3   jurisdiction by enjoining the conduct of prison officials who are not affiliated with Pelican

4   Bay.

5       However, CDC is mistaken to the extent it contends that this Court may not issue an

6   injunction that benefits individuals who are not named in this lawsuit. Appellate courts in

7   this and other circuits have rejected this argument, holding instead that injunctive relief may

8   be granted on a "class-wide" basis in employment discrimination cases despite the absence of

9   a class certified under Rule 23 of the Federal Rules of Civil Procedure. See Criswell v.

10  Western Airlines, Inc., 709 F.2d 544, 558 (9th Cir. 1983); see also Sprogis v. United Air

11  Lines, Inc., 444 F.2d 1194, 1202 (7th Cir. 1971) (affirming the district court's authority to

12  extend the scope of injunctive relief beyond the named plaintiff). Relying on a pair of

13  Seventh Circuit cases, the court in Criswell explained that "the evil to be eliminated [by Title

14  VII] is discrimination on the basis of class-wide characteristics, and for this reason the

15  interests of other members of the class are vindicated by the actual plaintiff[]." Criswell, 709

16  F.2d at 558, citing Bowe, 416 F.2d at 719-20. Because federal courts have a responsibility to

17  serve the public interest, they are vested with the discretion to devise remedies that both

18  provide individual relief and effectuate the policies underlying the Act. Criswell, 709 F.2d at

19  558, citing Sprogis, 444 F.2d at 1201. Accordingly, this Court has the authority to fashion an

20  injunction that benefits not only Plaintiff, but all female correctional officers and other staff

21  members at Pelican Bay who have been or may be harmed by CDC's unlawful conduct.

22      CDC also argues that injunctive relief should be denied because Plaintiff is no longer

23  employed by the department. CDC correctly states that some courts have held that the party

24  seeking equitable relief prohibiting future discrimination must be part of the class that

25  benefits from the injunction requested. See Amirmokri v. Baltimore Gas & Electric Co., 60

26  F.3d 1126, 1132 (4th Cir. 1995); Rau v. Apple-Rio Management Co., Inc., 85 F. Supp. 2d

27  1344, 1352 (N.D. Ga. 1999). However, courts that have refused to issue an injunction in

28

*United States District Court*
*For the Northern District of California*

1    such circumstances have done so because the plaintiff "did not seek reinstatement and failed

2    to show any 'other way in which he would benefit personally from the relief requested.'" Id.,

3    quoting Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1136 (11th Cir. 1984).

4    Here, Plaintiff is pursuing reinstatement through the administrative appeal she filed with the

5    California State Personnel Board, and thus is able to demonstrate that the equitable relief she

6    seeks can personally benefit her.[1] More importantly, courts in the Ninth Circuit have granted

7    injunctions requested on behalf of individuals who were no longer employed by the

8    defendants in question. See, e.g., Hacienda Hotel, 881 F.2d at 1519; EEOC v. Red Baron

9    Steak Houses, 1988 U.S. Dist. LEXIS 12425, at *14 (N.D. Cal. 1988). Thus, the fact that

10   Plaintiff is not presently a CDC employee, standing alone, is not a valid ground on which the

11   Court can refuse to grant an injunction that prohibits future unlawful conduct.

12       In sum, the Court concludes that injunctive relief is warranted in this case. The Court

13   will now move on to consider the proper scope of its remedial order.

14

15   **B. Nature and Scope of Appropriate Injunctive Relief**

16       Plaintiff's requests for equitable relief appear to fall into two categories.[2] First, as is

17   reflected in her ninth proposal, Plaintiff seeks a broad injunction prohibiting CDC from

18   engaging in conduct that violates Title VII. Plaintiff's remaining recommendations are more

19   specific in that they describe various approaches Plaintiff believes Pelican Bay officials

20   should take in responding to the problem of inmate exhibitionist masturbation. At this time,

21   only a more general remedial order is appropriate.

22

23   [1]The Ninth Circuit faced a similar, though not identical, situation in Nanty v. Barrows
     Co., 660 F.2d 1327 (9th Cir. 1981). In that case, the plaintiff, a Native American male,

24   alleged that the defendant discriminated against him on the basis of race when it refused to
     hire him as a delivery driver. The court held that because the plaintiff proved his claim of

25   unlawful employment discrimination, he was entitled to an injunction against future, or
     continued, discrimination. Id. at 1333. The court reasoned that such an order "ensure[s] that,

26   at the very least, the applicant will received full and fair consideration from the employer if
     he seeks similar employment in the future." Id. Here, Plaintiff contends that she is entitled

27   to the same type of protection as she attempts to navigate the reinstatement process.

     [2]The ten policies and procedures Plaintiff asks the Court to order CDC to implement
28   need not be reiterated here.

6

United States District Court
For the Northern District of California

1    It is not uncommon for courts to issue injunctions prohibiting practices that violate

2  Title VII. See, e.g., Hacienda Hotel, 881 F.2d at 1518-19 (affirming the district court's

3  decision to permanently enjoin the defendant from "engaging in any employment practice

4  which discriminates on the basis of sex, religion, and opposition to practices made unlawful

5  by Title VII"); Goodyear Aerospace, 813 F.2d at 1544 (affirming the district court's order

6  enjoining the defendant from retaliating in violation of Title VII); Ilona of Hungary, 108 F.3d

7  at 1579 (affirming the issuance of a permanent injunction that prohibited the defendant from

8  discriminating against its employees on the basis of religion); Red Baron Steak Houses, 1988

9  U.S. Dist. LEXIS 12425, at *14 (entering a remedial order prohibiting the defendant from

10  committing any future violations of Title VII, including retaliation against employees who

11  oppose practices made unlawful by the Act). In this case, an injunction will instruct CDC

12  that it must comply with federal law, subject CDC to the contempt power of the federal

13  courts should it commit future violations, and reduce the chilling effect of its retaliation on

14  Pelican Bay employees' exercise of their federally protected rights. Goodyear Aerospace,

15  813 F.2d at 1544.

16    CDC has offered no evidence to suggest that it will effectively respond to the sexually

17  hostile work environment created by inmate exhibitionist masturbation at Pelican Bay or that

18  it will adequately address concerns employees have about the inmates' misconduct. See

19  Hacienda Hotel, 881 F.2d at 1519 (holding that the district properly concluded that an

20  injunction was required based on its finding that the defendant did not take prompt remedial

21  action when made aware of the sexual harassment allegations against it). CDC has, at every

22  stage of this litigation, insisted that its actions do not constitute violations of Title VII, even

23  going so far as to blame Plaintiff for the treatment she received. Under the circumstances,

24  there is a distinct possibility that CDC's unlawful employment practices can and will persist.[3]

25

26    [3]At this point, an admission of some degree of liability by CDC and a promise to
comply with Title VII in the future would be inadequate to preclude the entry of a remedial

27  order, as "'[p]rotestations or repentance and reform timed to anticipate or blunt the force of a
lawsuit offer insufficient assurance' that the practice sought to be enjoined will not be

28  repeated." Stockham Valves & Fittings Co., 559 F.2d at 354-55 (citations omitted); see
Goodyear Aerospace, 813 F.2d at 1545 (observing that a defendant's "eleventh hour change

United States District Court
For the Northern District of California

1   Accordingly, injunctive relief is needed to prohibit CDC from continuing to tolerate a

2   sexually hostile work environment at Pelican Bay and to ensure that it no longer retaliates

3   against officers who speak out against the illegality. See Bouman, 940 F.2d at 1233 (stating

4   that a district court "may order injunctive relief where there are not sufficient assurances that

5   the employer is unlikely to repeat its discriminatory practices"); Stockham Valves & Fittings

6   Co., 559 F.2d at 355 (concluding that the district court must enter a broad injunction

7   prohibiting discrimination by the defendant unless the lower court "can discern and identify

8   clear and convincing evidence that there is no reasonable probability of further

9   noncompliance"); see also Goodyear Aerospace, 813 F.2d at 1544-45 (holding that the

10  district court abused its discretion by denying an injunction without making any finding

11  regarding the likelihood that the defendant would repeat its discriminatory practices).

12      The Court concludes that injunctive relief is needed to "deter [CDC] from future

13  unlawful discrimination and protect [Pelican Bay] employees from retaliation for exercising

14  their rights under the Act." Red Baron Steak Houses, 1998 U.S. Dist. LEXIS 12425, at *14.

15  The Court hereby formalizes the oral order issued at the August 11, 2003 hearing by entering

16  the following permanent injunction:

17      The California Department of Corrections, its agents, officers, successors in office,
        employees and all persons acting in concert or participating with the department are
18      permanently enjoined from engaging in any employment practices, or taking any other
        personnel action, for the purpose or with the effect of maintaining a sexually hostile
19      work environment at Pelican Bay State Prison, or otherwise discriminating against any
        Pelican Bay State Prison employee on the basis of sex. The California Department of
20      Corrections, its agents, officers, successors in office, employees and all persons acting
        in concert or participating with the department are further enjoined from engaging in
21      any employment practices, or taking any other personnel action, for the purpose or
        with the effect of retaliating against any Pelican Bay State Prison employee for
22      complaining about, or otherwise opposing, practices made unlawful by Title VII.

23      With respect to Plaintiff's remaining requests for equitable relief, the Court denies the

24  instant motion without prejudice to Plaintiff raising the issue at some later point in time. As

25  CDC notes, Plaintiff's suggestions are vague and lacking in sufficient detail. As they are

26  presently formulated, the proposals are conclusory and void of any discussion of feasibility,

27

28  of heart" does not demonstrate that it is unlikely to repeat its discriminatory actions).

8

1  practicality, necessity, constitutionality, effectiveness, or cost. Though CDC has indicated a

2  willingness to consider some of Plaintiff's requests, it argues that it is premature for the

3  Court to enter an injunction at this time. CDC asks the Court to defer ruling on this motion,

4  during which time counsel for the two sides can meet and confer to develop more specific

5  remedial protocols.

6      The parties' incomplete presentations, coupled with the complexity of the task of

7  fashioning a remedial order in this context, counsel against the Court issuing a

8  comprehensive injunction at this time. Though they have ably served their respective clients

9  during the life of this case, the Court has concerns as to whether counsel have the knowledge,

10  experience, and resources necessary to fashion a remedial plan that specifies the corrective

11  actions Pelican Bay must take to facilitate future compliance with federal civil rights laws.

12  Now that CDC's liability under Title VII has been determined, further discussions regarding

13  the substance of a more detailed injunction are needed.

14      The Court believes it is best to refer this matter to Special Master John Hagar and the

15  team created to monitor compliance with the mandate set forth in Madrid v. Gomez, 889 F.

16  Supp. 1146 (N.D. Cal. 1995). As the group's recent findings indicate, they have made

17  substantial progress in devising a plan to address the problem of inmate exhibitionist

18  masturbation. They have given considerable thought to this issue, they possess an impressive

19  body of knowledge about Pelican Bay, they are able to call upon a wealth of experience and

20  number of useful resources, and they appear to have formed a cooperative relationship that is

21  well-suited for this difficult endeavor. As to the substance of their findings, Mr. Hagar and

22  his colleagues have learned that there is a significant mental health component to the

23  problem of inmate exhibitionism, and they have identified the need to integrate

24  administrative sanctions with mental health treatment. They seem to be well on the way to

25  developing a meaningful remedy that incorporates various responses to the inmates' behavior

26  and training for the correctional officers and mental health staff who will be primarily

27  responsible for implementing the plan on a day-to-day basis. The Court will ensure that the

28

United States District Court
For the Northern District of California

1 parties to this lawsuit are invited to take part in future discussions with the Madrid team

2 about appropriate equitable relief.

3

4 **IV. CONCLUSION**

5     For the reasons discussed herein, Plaintiff's Motion to Amend Judgment to Include

6 Permanent Injunctive Relief is GRANTED IN PART AND DENIED IN PART.

7 Specifically, the Court issues an injunction prohibiting Pelican Bay officials from committing

8 further violations of Title VII. The Court refers the remainder of this matter to Special

9 Master John Hagar and the Madrid v. Gomez team for development of a remedial plan to

10 address the problem of inmate exhibitionist masturbation. To the extent practical, the parties

11 to this action will be permitted to participate in this process.

12     As it noted during oral argument, the Court will retain jurisdiction over this matter.

13 The partial denial of Plaintiff's motion is without prejudice to Plaintiff making an

14 appropriate request to formalize the protocols developed in conjunction with the Madrid

15 team. The parties are to appear for a Case Management Conference on November 17, 2003,

16 at 1:30 p.m., at which time counsel should provide the Court with a report of their progress.

17 A joint Case Management Conference Statement shall be filed no later than November 7,

18 2003.

19

20 **IT IS SO ORDERED.**

21

22 DATED 8/18/03

23 THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

24

25

26

27

28

10

rbe

United States District Court
for the
Northern District of California
August 18, 2003

* * CERTIFICATE OF SERVICE * *

Case Number:3:00-cv-02278

Freitag

vs

CDC

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on August 18, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

Pamela Y. Price, Esq.
Price and Associates PLC
1617 Clay Street
Oakland, CA 94612

John L. Burris, Esq.
Law Offices of John L. Burris
7677 Oakport Street, Suite 1120
Oakland, CA 94621

Richard L. Manford, Esq.
Attorney General's Office
1300 I. Street, Room 125
P.O. Box 944255
Sacramento, CA 94244-2550

Marybelle Archibald, Esq.
CA State Attorney General's Office
1300 I St Ste 125
P.O. Box 944255
Sacramento, CA 94244-2550

Richard W. Wieking, Clerk

BY: _____
Deputy Clerk

# EXHIBIT  B

### PELICAN BAY STATE PRISON
### PLAN FOR MANAGEMENT OF
### INDECENT EXPOSURE INCIDENTS

## POLICY

Indecent exposure is not tolerated. Indecent exposure is the willful and lewd exposure of a person, or the private parts thereof, in any place where there are present other persons to be offended or annoyed thereby. Indecent exposure can also be the result of a mental illness. Every Indecent Exposure Incident (IEI) shall be reported, tracked, managed, disciplined, and prosecuted as set forth in this policy. An inmate who indecently exposes himself shall be subject to a variety of security measures in an attempt to eliminate the behavior and reduce the opportunity to repeat an IEI.

Employees who observe an IEI shall be provided support from the institution, such as the Employee Assistance Program, the Employee Post Trauma Program, and security measures.

### Identification

An IEI may be the result of a conduct problem or mental illness.

> **Conduct Problems:** Some inmates expose themselves solely to cause affront and alarm, disrupt prison operations, offend staff, or because of illegal drug use.

> **Mental Illness:** Some inmates expose themselves because of a serious mental disorder, or because of a diagnosis called Exhibitionism.

### Incident Reporting and Tracking

Every IEI shall be documented by the observing employee on a CDC Form 115, Rules Violation Report (RVR). If the exposure of one's genitals to staff is considered to be unusual and bizarre behavior, a mental health evaluation is to be included in the RVR process. In addition, the IEI shall be reported as an incident on the Crime/Incident Report Part A (CDC 837 A) and Attachments Part B – Involved Parties and Part C – Supplement. This incident package will be processed according to standard institution procedures *with a copy sent to the Madrid Compliance Unit.* All IEI CDC 837's shall be referred to the District Attorney of Del Norte County as explained in District Attorney Referrals below. Inmate clerks shall not be utilized in the preparation/typing of IEI related CDC Form 115.

The Facility Captains shall be responsible for identifying all IE offenders within their assigned area using the Automated Disciplinary Management System (ADMS) tracking system. Documentation and tracking are distributed on a quarterly basis to supervisors, the Indecent Exposure Review Committee (IERC), (see "Monitoring Committee" below), Mental Health Management, and unit staff.

Revised 03/19/04

**District Attorney Referrals**

1.    All IEIs shall be evaluated for referral to the Del Norte District Attorney.

2.    The IERC shall prepare written standards for District Attorney referrals of IEIs for approval by the Warden.

3.    The Warden shall inform the District Attorney in writing of the standards under which Pelican Bay State Prison will refer IEI cases for criminal prosecution, including the reason why certain misdemeanor cases require prosecution regardless of the underlying criminal offense that lead to the inmate's incarceration.

4.    The IERC shall, no less than semi-annually, publish a status report concerning IEI cases referred to the District Attorney, a copy of which shall be provided to the Warden and the District Attorney.

**Discipline  Sanctions**

Inmates found guilty of committing an IEI offense through the inmate disciplinary process may b e s ubject t o c redit a nd p rivilege l osses i ncluding c anteen, a ppliances, a nd a nnual package restrictions per the Pelican Bay State Prison IEI retention pilot program.  Inmates found guilty of committing multiple IEI offenses may also be subject to the imposition of an "R" suffix related classification change.

**Mental Health Referral and Evaluation**

1.    An inmate who engages in indecent exposure shall receive a mental health screening. At the same time, custody will implement security precautions as described below.

2.    Offenders who are already enrolled in the Mental Health Services Delivery System (MHSDS) will have this issue addressed by the mental health Interdisciplinary Treatment Team (IDTT) assigned to that unit.  The IDTT may recommend specific behavioral security precautions, in addition to appropriate adjustments to medications and/or other therapeutic interventions, in an effort to reduce the behavior.

3.    Those inmates who are found, on the basis of a mental health screening or comprehsive mental health evaluation, to have a condition which warrants entry into the MHSDS will be placed in the appropriate program if not already enrolled.   A diagnosis of Exhibitionism requires entry into the MHSDS under the medical necessity designation.

Revised 03/19/04

4. The results of IDTT IEI related mental health screenings shall be summarized in writing and presented to the IERC no less than quarterly.

5. Inmates who are not entered into the MHSDS after the mental health screening, will continue to receive ongoing oversight (and intervention if indicated) from the mental health professionals who serve on the IERC (see "Monitoring Committee" below).

## Security Measures

Inmates who engage in acts of indecent exposure will be subjected to security measures that are designed to decrease the opportunity for the inmate to repeat the behavior and/or minimize the impact that the behavior has on prison staff. Security measures are tools used by staff for a determinate period to identify, prevent, and curtail the threatening behavior.

There are two kinds of security measures, precautions and restrictions. Security precautions are not used as a punishment and should not be confused with disciplinary restrictions. Security Precautions procedures for the Security Housing Unit (SHU) are found in Operational Procedure (OP) 222 and for the Psychiatric Services Unit (PSU) in OP 223. Security Restrictions are applied as a result of a disciplinary action where inmates are afforded due process.

Security precautions are implemented by correctional officers/sergeants and approved, tracked, and reviewed by the Facility Captain/Lieutenant on a weekly basis. In PSU, SHU and Administrative Segregation Units (ASU), these precautions are reviewed weekly by the IDTT as appropriate.

The security measures set forth below may be applied as a result of a guilty finding on an IEI-RVR, or as an interim measure, pending the adjudication of an IEI-RVR.

- Temporary restriction from yard or other settings which may provide a venue for the behavior.
- Use of an Exposure Control Jumpsuit to limit the ability of the inmate to engage in the behavior.
- Lexan cell and/or side-window covering, or other devices to limit the ability of the inmate to be observed while engaging in the behavior.
- Substitution of activity setting to reduce the possibility of the behavior impacting staff (e.g., concrete yard substituted for regular yard setting.).

## Custody Training

Until the Management of Inmate Indecent Exposure Lesson Plan is finalized and approved for use by the Correctional Peace Officers Standards and Training (CPOST) office, structured orientation shall be provided to all custody staff.

## Clinical Staff Training

Revised 03/19/04

Mental Health Services staff will receive mandatory training on diagnostic criteria, clinical evaluation procedures, behavioral measures, and appropriate treatment strategies.

## Employee IEI Policy Recommendations

All staff shall be allowed to make IEI policy recommendations to their supervisor at any time. Written recommendations shall be submitted to the employee's supervisor who shall forward the recommendation to the IERC. The IEI policy may be updated to incorporate any changes adopted by management.

## Monitoring Committee

The Indecent Exposure Reviw Committee (IERC) will monitor the implementation and effectiveness of the policy and procedures set forth above. The IERC will meet no less than quarterly. The IERC is comprised of administrative staff at the level of Associate Warden, Chief or Senior Psychiatrist and Chief or Senior Psychologist, and other Mental Health staff as appropriate, Custodial Management, Litigation Coordinator, and a Recorder who will prepare minutes from the meeting. The Warden may invite representatives from employee bargaining units if he, in his discretion, believes their participation will be beneficial to the monitoring process and that their presence does not compromise inmate medical/mental health privacy rights. The IERC will evaluate policy compliance and effectiveness, and monitor the impact of environmental modifications, and clinical programs using the tracking reports, Incident Reports, and the Reporting Employee Indecent Exposure Report.


**JOE MCGRATH**            Date  _____
**Warden**



**JEANNIE WOODFORD**       Date  _____
**Director of Corrections**

Revised 03/19/04

## PLAN FOR MENTAL HEALTH TREATMENT
## OF INMATES WITH EXHIBITIONISM
## WHO HAVE ENGAGED IN INDECENT EXPOSURE INCIDENTS

I.    **Introduction:** If the patient does not have a serious mental disorder, but does have a diagnosis of Exhibitionism, the patient will be included in the MHSDS under the "Medical Necessity" designation.

II.    **Purpose:** To provide those inmates diagnosed with Exhibitionism who have engaged in indecent exposure incidents with mental health treatment to focusing upon the prevention of exhibitionist acts in the correctional environment.

III.    **Patient Criteria:** Patients will be accepted for treatment for Exhibitionism only when they meet all of the following criteria:

    A. The patient engages in an indecent exposure incident in the correctional environment.
    .B.  The patient receives a diagnosis of Exhibitionism following the assessment procedures set forth in Procedure for Clinical Assessment of Inmate Indecent Exposure by the Mental Health Department.
    C. The patient is amenable to treatment in the opinion of the evaluating psychologist.
    D. The patient provides informed consent to participate in the treatment.

IV.    **Treatment Modalities**

    A. This treatment modality will focus on assisting the patient to develop self-management strategies to reduce or prevent acting out on exhibitionistic urges. This therapy will be provided in the context of:

        1. Individual psychotherapy once per week with a case manager (psychologist or LCSW) specifically trained in providing this type of therapy to exhibitionists.

        2. Group therapy by a psychologist or Psychiatric Social Worker specifically trained in providing this type of therapy to exhibitionists, with other exhibitionists, two times per week for a total of at least three hours. Group therapy will only be provided when three or more patients in the same unit agree to participate and adequate security measures can be implemented to provide for such therapy.

    B. Psychiatric consultation and psychotropic medication management. Any patient in the Mental Health Services Delivery System with a diagnosis of Exhibitionism shall be seen in consultation by the unit psychiatrist. The unit psychiatrist will:

        1. Review the diagnostic assessment.

        2. Assess for the possibility of Exhibitionism due to illegal drug use.

        Revised 03/19/04

3.  Rule out medical causes such as excessively elevated testosterone.

4.  Discuss the use of high dose Selective Serotonin Reuptake Inhibitor therapy for Exhibitionism with the patient.

5.  Prescribe and monitor Selective Serotonin Reuptake Inhibitor therapy.

## IV.  Treatment Reviews

A.  Primary responsibility for the monitoring of treatment for patients with Exhibitionism is the responsibility of the Interdisciplinary Treatment Team (IDTT) for each patient's unit, under the direction of the senior psychologist for that unit. IDTT reviews of patients in treatment for Exhibitionism will occur at least every 90 days and will specifically address the occurrence of CDC 115s and the assessment of progress with treatment.

B.  Collaboration with custody will occur regarding the use of security measures imposed by custody. The IDTT will provide input into decisions about the length of time each security measure is imposed.

2

Revised 03/19/04

State of California                                                    Department of Corrections

# Memorandum

Date  : March 1, 2005

To    : Richard Kirkland
        Warden
        Pelican Bay State Prison

# INSTRUCTIONAL

Subject : **PILOT PROGRAM FOR MANAGEMENT OF INDECENT EXPOSURE INCIDENTS AT PELICAN BAY STATE PRISON**

## PURPOSE

This Instructional Memorandum announces the establishment and implementation of the California Department of Corrections (CDC) Management of Indecent Exposure Incidents Pilot Program at Pelican Bay State Prison (PBSP), effective immediately.  The purpose of the program is to encourage acceptable behavior among inmates and to provide a work environment in which staff are not subject to a sexually hostile work environment because of inmate sexual misconduct.  This pilot program is designed to discourage inmates from engaging in indecent exposure and sexual disorderly conduct.

## BACKGROUND

The CDC has identified a need to promote compliance with regulations and policies among inmates that commit indecent exposure violations.  When an inmate deliberately exposes his genitals to a staff member under circumstances likely to cause affront, there is a legal mandate requiring a prompt and effective remedial action be taken on the part of CDC.   This Plan for the Management of Indecent Exposure Incidents will require that inmates found guilty of committing an indecent exposure offense would be subject to credit and privilege losses including canteen, appliances, and annual package restrictions in excess of those currently provided for in the California Code of Regulations (CCR), Title 15, Crime Prevention and Corrections. Additionally, inmates found guilty of committing indecent exposure offenses may also be subject to the assessment of an "R" suffix at the discretion of the classification committee and retention in the Security Housing Unit (SHU).

Inmates who engage in acts of indecent exposure will be subjected to security measures that are designed to decrease the opportunity for the inmate to repeat the behavior and/or minimize the

impact that the behavior has on prison staff. Security measures are tools used by staff for a determinate period to identify, prevent, and curtail the threatening behavior.

There are two kinds of security measures, precautions and restrictions. Security precautions are not used as a punishment and should not be confused with disciplinary restrictions. Security restrictions are applied as a result of a disciplinary action where inmates are afforded due process.

**Security precautions consist of such actions as:**

    a.    Temporary restriction from yard or other settings, which may provide a venue for the behavior.

    b.    Use of an Exposure Control Jumpsuit to limit the ability of the inmate to engage in the behavior.

    c.    Brightly colored Lexan cell covering and/or side-window covering, or other devices to limit the ability of the inmate to be observed while engaging in the behavior.

    d.    Substitution of activity setting to reduce the possibility of the behavior impacting staff (e.g., concrete yard substituted for regular yard setting.).

# PROGRAM COMPONENTS

## Definitions:

Indecent Exposure means every person who willfully and lewdly, either; 1) exposes their person, or the private parts thereof, in any public place, or in any place where there are other persons present to be offended or annoyed thereby; or 2) procures, counsels, or assists any person so to expose themselves or take part in any model artist exhibition, or to make any other exhibition of themselves in public view, or the view of any number of persons, such as is offensive to decency, or is adapted to excite to vicious or lewd thoughts or acts.

Sexual Disorderly Conduct means every person who touches his genitals or buttocks in a manner, or other circumstance of this touching, that demonstrates it is for the purpose of sexual arousal, gratification, annoyance, or offense, and that any reasonable person would conclude this conduct would be offensive.

## Disciplinary:

Any inmate found guilty of indecent exposure, or sexual disorderly conduct (sexual misconduct, i.e., masturbation/fondling underneath his clothing within the view of others), will be subject to privilege losses.

The suspension of privileges pursuant to this Pilot Program at Pelican Bay State Prison for violations of existing Title 15, Division 3, Sections 3007, 3323(d)(7), and 3323(f)(5) shall be assessed as follows [see Section 3999.1.9(f)(5)(K)]:

A finding of guilt for a first offense violation may result in loss of any or all of the following for up to 90-days period:

    (1)    Loss of canteen
    (2)    Loss of appliances
    (3)    Annual packages
    (4)    Telephone privileges
    (5)    Loss of personal property

A finding of guilt for a second offense violation may result in loss of any or all of the following for up to 180-days period:

    (1)    Loss of canteen
    (2)    Loss of appliances
    (3)    Annual packages
    (4)    Telephone privileges
    (5)    Loss of personal property

**Assessment of a SHU Term:**

Special or security housing units are designed for extended term programming of inmates not suited for General Population. Placement into, and release from these units requires the approval by a Classification Services Representative (CSR). An inmate whose conduct endangers the safety of others, or the security of the institution, shall be housed in the SHU. The inmate has to be found guilty of an offense for which a determinate term of confinement has been assessed, or is deemed to be a threat to the safety of others, or the security of the institution. A determinate period of confinement in the SHU may be established for an inmate when found guilty of two or more IE offenses in a one-year period per Section 3999.1.10 (c)(9)(H), Harassment of another person, group, or entity either directly or indirectly or directly through the use of mail or other means. The term shall be established by the Institutional Classification Committee (ICC) utilizing the standards in the SHU Term Assessment Chart Section 3999.1.10 (c)(9)(H). Therefore, when ICCs are reviewing and assessing a SHU term for this offense, committee members are to consider and encouraged to suspend the first SHU term with the remaining disciplinary and/or security precautions in place for a six-month period. The totality of the inmate's case factors, including length of time incarcerated, disciplinary, work, education, laudatory, and programming history, as well as the circumstances of the incident, are to be evaluated when imposing a SHU term.

**Classification:**

A General Population inmate charged with two or more indecent exposure offenses in a one-year period (IE offender) will be placed in the Administrative Segregation Unit (ASU) and reviewed by the ICC for evaluation for SHU placement and "R" suffix application per Section 3999.1.11. ASU placement may also be appropriate for an inmate who would otherwise be housed behind a solid door in GP if a solid door is unavailable.

The application of the "R" suffix shall be initiated by the assigned Correctional Counselor when an inmate has been found guilty in a disciplinary hearing for indecent exposure or other disorderly conduct.

## STATEMENT AS TO DURATION OF THE PILOT PROJECT:

This pilot project will remain in effect through March 1, 2007. There will be an ongoing assessment of the pilot project through the PBSP Indecent Exposure Review Committee (IERC). The IERC was established to monitor the implementation and effectiveness of the policy and procedures as set forth in PELICAN BAY STATE PRISON PLAN FOR MANAGEMENT OF INDECENT EXPOSURE INCIDENTS. The IERC will meet no less than quarterly. The IERC is comprised of administrative staff at the level of Associate Warden, Chief or Senior Psychiatrist, Chief or Senior Psychologist, and other Mental Health staff as appropriate, Custodial Management, Litigation Coordinator, and a Recorder who will prepare minutes from the meeting. The Warden may invite representatives from employee bargaining units if he, in his discretion, believes their participation will be beneficial to the monitoring process and that their presence does not compromise inmate medical/mental health privacy rights. The IERC will evaluate policy compliance and effectiveness, and monitor the impact of environmental modifications, and clinical programs using the tracking reports, Incident Reports, and the Reporting Employee Indecent Exposure Report.

## PILOT PROGRAM REQUIREMENTS

The Plan for the Management of Indecent Exposure Incidents is operating as a pilot program pursuant to Penal Code Section 5058.1. The pilot program in intended to focuses on inmates who engage in acts of indecent exposure and is expected to reduce the inappropriate behavior.

## PILOT PROGRAM LOCATION

The establishment of the pilot program shall be at Pelican Bay State Prison. Please inform all concerned persons of this Instructional Memorandum. This Pilot Program shall remain in effect through March 1, 2007, at which time it will lapse by operation of law or will be promulgated through the Administrative Procedure Act. Direct all inquiries to Richard Kirkland, Warden, Pelican Bay State Prison, at (707) 465-1000.


J. S. WOODFORD
Director

## PELICAN BAY STATE PRISON MANAGEMENT OF INDECENT EXPOSURE INCIDENTS PILOT PROGRAM

**Section 3999.1.8. Pelican Bay State Prison Management of Indecent Exposure Incidents**
(a) Indecent Exposure means every person who willfully and lewdly, either: 1) exposes their person, or the private parts thereof, in any public place, or in any place where there are other persons present to be offended or annoyed thereby; or 2) procures, counsels, or assists any person so to expose themselves or take part in any model artist exhibition, or to make any other exhibition of themselves in public view, or the view of any number of persons, such as is offensive to decency, or is adapted to excite to vicious or lewd thoughts or acts.

(b) Sexual Disorderly Conduct means every person who touches his genitals or buttocks in a manner, or other circumstance of this touching, that demonstrates it is for the purpose of sexual arousal, gratification, annoyance, or offense, and that any reasonable person would conclude this conduct would be offensive.

NOTE: Authority cited: Sections 5058, and 5058.1, Penal Code; Sections 314 and 5054 Penal Code.

## 3999.1.9. Pelican Bay State Prison - Serious Rule Violations.

(a) Inmate misconduct reported on a CDC Form 115 shall be classified serious if:

(1) It is an offense punishable as a misdemeanor not specified as administrative in section 3314(a)(3) or is a felony, whether or not prosecution is undertaken.

(2) It involves any one or more of the following circumstances:

(A) Use of force or violence against another person.

(B) A breach of or hazard to facility security.

(C) A serious disruption of facility operations.

(D) The introduction or possession of controlled substances or dangerous contraband.

(E) An attempt or threat to commit any act listed in (A) through (D), coupled with a present ability to carry out the threat or attempt if not prevented from doing so.

(3) Serious rule violations include but are not limited to:

(A) Misconduct reportable to the inmate's releasing authority.

(B) Theft, destruction, misuse, alteration, damage, unauthorized acquisition or exchange of personal or state property amounting to more than $50.

(C) Hideout, preparation to escape, or possession of escape paraphernalia.

(D) Tattooing or possession of tattoo paraphernalia.

(E) Manufacture of alcohol or possession of any controlled substance, unauthorized drug, intoxicant, or illegal substance.

(F) Being under the influence (use) of alcoholic beverages, controlled substances, unauthorized drugs or intoxicants in an institution, community correctional facility, or camp.

(G) Possession of five dollars or more without authorization.

(H) Acts of disobedience or disrespect, which by reason of intensity or context, create a potential for violence or mass disruptive conduct.

(I)  Willfully inciting others to commit an act of force or violence.

(J)  Refusal to perform work or participate in a program as ordered or assigned.

(K)  Recurring failure to meet work or program expectations within the inmate's abilities when lesser disciplinary methods failed to correct the misconduct.

(L)  Participation in a strike or work stoppage.

(M)  A repeated pattern of administrative rule violations for the same offense.

(N)  Mail or visiting violations presenting a threat as described in (2) above.

(O)  Harassment of another person, group, or entity either directly or indirectly through the use of the mail or other means.

(P)  Throwing any liquid or solid substance on a nonprisoner.

(Q)  Unauthorized possession of departmental records or documents which could affect any inmate's release status.

(R)  Refusal to submit to a test for controlled substances.

(S)  Refusal to provide blood specimens, a saliva sample, and palm and thumb print impressions pursuant to Penal Code sections 295 through 300.3, after receiving written notification in accordance with PC section 298.1 that such specimens and samples must be provided. The samples and specimens may be requested again, after 30 days or more following any such refusal. Compliance shall not be compelled forcibly, unless specific written judicial authority to do so has been obtained.

(T)  Participation in gambling.

(U)  Late return or failure to return from a temporary community release or leave.

(V)  Unauthorized possession of materials or substances which have been diverted or altered from the original manufactured state or purpose with the potential to be made into a weapon; explosive or explosive-making material; poison, caustic substance; any destructive device.

(W)  Self-mutilation or attempted suicide for the purpose of manipulation.

(X)  Involvement in a conspiracy or attempt to do any of the above.

(b)  In addition to the disciplinary hearing, the inmate may be subject to segregation from the general population pursuant to sections 3312 and 3335 through 3345; and referral for prosecution when the misconduct is a criminal offense.

(c)  Hearing. Serious rule violations shall be heard at the senior hearing officer or higher level. A senior hearing officer shall not be below the level of a facility captain, correctional captain, correctional counselor III, parole agent III, or an experienced correctional lieutenant, correctional counselor II, or parole agent II.

(d)  An inmate shall be assigned an employee to assist in the investigation of matters pertaining to a disciplinary action when the chief disciplinary officer or designee determines the necessity based on the following criteria.

(1)  Investigative Employee.

(A)  An investigative employee, as described in section 3318(a), shall be assigned, within one working day after the serious rule violation charges have been submitted for processing when the chief disciplinary officer or designee determines that:

1.  The complexity of the issues require further investigation.

2.  The housing status makes it unlikely the charged inmate can collect and present the evidence necessary for an adequate presentation of a defense.

3.  A determination has been made that additional information is necessary for a fair hearing even if the inmate has waived the assignment.

(B)    Staff who witnessed or who will serve as a hearing official for a rule violation shall not serve as the investigative employee for that violation.

(c)    The inmate may not select the investigative employee, but may object to the one assigned, in which case, a second investigative employee shall be assigned to complete the investigation. The inmate's objection must be expressed prior to the beginning of the investigation.

(D)    Assignment of an investigative employee shall not preclude the assignment of a staff assistant.

(2)    Staff Assistant.

(A)    The inmate shall be assigned a staff assistant, as described in section 3318(b), to assist in the investigation, preparation, and presentation of a defense at the disciplinary hearing if the chief disciplinary officer or designee determines:

1.    The inmate is illiterate or non-English speaking.

2.    The complexity of the issues are such that assistance is necessary so the inmate comprehends the nature of the charges or the disciplinary process.

3.    The nature of the inmate's need for assistance requires a confidential relationship as described in subsection 3318(b)(2)(A).

(B)    An inmate may refuse to accept the first staff assistant at the time of assignment or at any time during the disciplinary process.

(C)    If the inmate refuses the staff assistant at the time of initial assignment, a second staff assistant shall be assigned.

(D)    If the inmate refuses to accept the second staff assistant or withdraws acceptance of an assigned staff assistant, the assignment of another staff assistant shall not be required unless the chief disciplinary officer or designee determines that a fair hearing cannot be held without staff assistance.

(E)    Assignment of a staff assistant shall not preclude assignment of an investigative employee.

(e)    Witnesses.    An inmate may request that friendly and adverse witnesses attend the hearing.

(1)    Requested witnesses shall be called unless the official conducting the hearing denies the request for one of the following reasons:

(A)    The appearance would endanger the witness.

(B)    The official determines that the witness has no relevant or additional information.

(C)    The witness is unavailable.

(2)    If an inmate's request for a witness is denied, the reasons shall be documented on the CDC Form 115.

(3)    Whether or not the inmate requests a witness, witnesses may be called if the official conducting the hearing determines the witnesses may have information necessary to the finding of fact.

(4)    The reporting employee shall attend the disciplinary hearing if requested by the inmate.

(5)    Under the direction of the official conducting the disciplinary hearing, the inmate has the right to ask questions of all witnesses called.

(6)    Nothing in this section shall preclude making a witness available by telephone for a disciplinary hearing.

(f)    Disposition. Upon completion of the fact-finding portion of the disciplinary hearing, the inmate may be found:

(1)    Not guilty and the charges dismissed.

(2)  Guilty of an administrative rather than a serious rule violation. In such case, the CDC Form 115 shall be reclassified as administrative and the inmate may be assessed only a disposition authorized in section 3314.

(3)  Guilty as charged or guilty of an included serious rule violation and assessed a credit forfeiture pursuant to section 3323.

(4)  If the violation included an act related to the use, possession, or distribution of controlled substances, controlled medication, drugs or drug paraphernalia; or if the inmate refused to submit to a test for controlled substances or drugs, the disposition shall include an order for the inmate to submit to mandatory random drug testing for one year from the date of the order.

(A)  For the first offense, the inmate must provide a minimum of one random drug test per month for one year.

(B)  For the second offense, the inmate must provide a minimum of two random drug tests per month for one year.

(C)  For the third offense, the inmate must provide a minimum of four random drug tests per month for one year.

(D)  The inmate shall be informed that refusal to submit to a random test or any positive test result during the mandatory random drug testing period shall result in the issuance of a CDC Form 115 and a new mandatory drug testing order.

(5)  The disposition may or when mandated shall include assessment of one or more of the following:

(A)  Any combination of penalties authorized for administrative rule violations in section 3314(e).

(B)  Suspension of privileges specified by the hearing official for no more than a 90-day period starting the date of the disciplinary hearing. The suspension of privileges for violations of subsections 3323(c)(7) and 3323(d)(6) shall be assessed as follows:

1.  Thirty days for the first offense.

2.  Sixty days for the second offense.

3.  Ninety days for the third offense.

(C)  Disciplinary detention or confinement to quarters as provided in sections 3330 and 3333 for not more than a ten-day period. If facility security will not be jeopardized, the inmate shall be released to attend work and program assignments.

1.  Second offense violations of subsections 3323(c)(7) and 3323(d)(6) shall result in confinement to quarters for five days.

2.  Third offense violations of subsections 3323(c)(7) and 3323(d)(6) shall result in confinement to quarters for 10 days.

(D)  Referral to a classification committee for consideration of placement in Work Group C.

(E)  Parole violators returned-to-custody who violate subsections 3323(c)(7) and 3323(d)(6) shall be referred to the Board of Prison Terms for consideration of extension of revocation time.

(F)  Suspension of all or part of dispositions other than credit forfeitures, ordered random drug testing and classification committee referrals, for up to six months based on the inmate's compliance with the conditions specified for suspension.

(G)  Imposition of all or part of an existing suspended disposition when the current rule violation is a violation of conditions specified in a suspended disposition. Imposition of a suspended disposition shall not include confinement to quarters or disciplinary detention for a period exceeding ten days except as provided in section 3322.

(H)    For a violation of subsection 3323(c)(7), there shall be a loss of visits for one year to be followed by non-contact visits for two years.

(I)     Loss of visits to be followed by non-contact visits for violations of subsection 3323(d)(6) shall be as follows:

1.    Loss of visits for 90 days, to be followed by non-contact visits for 90 days for the first offense.

2.    Loss of visits for 90 days, to be followed by non-contact visits for 180 days for the second offense.

3.    Loss of visits for 180 days, to be followed by non-contact visits for 180 days for the third offense.

(J)    Violation of subsections 3323(c)(7) and 3323(d)(6) shall result in:

1.    For the first offense, the inmate shall be required to attend Alcoholic Anonymous or Narcotic Anonymous meetings or assigned to a substance abuse education program to the extent such programs are available in the institution/facility.

2.    For the second offense, the inmate shall be referred for endorsement to a substance abuse program, provided that program eligibility criteria is met.

3.    For the third offense, the inmate shall be referred for endorsement to a substance abuse program, provided that program eligibility criteria is met, and mandatory treatment shall be a condition of parole.

(K)    Violation of Indecent Exposure or sexual disorderly conduct for subsections 3007, 3323(d)(7), and 3323(f)(5) shall result in:

1.    First offense violation may result in loss of any or all of the following for up to 90 days: loss of canteen, loss of appliances, annual and/or quarterly packages, telephone privileges, and loss of personal property.

2.    Second and subsequent violation(s) may result in loss of any or all of the following for up to 180 days: loss of canteen, loss of appliances, annual and/or quarterly packages, telephone privileges, and loss of personal property.

(g)    Classification Committee Review. Any serious disciplinary action requiring reconsideration of an inmate's program, work group, or housing assignment, shall be referred to the next reasonably scheduled classification committee for review. This review shall not occur until the chief disciplinary officer's audit of the CDC Form 115 has been concluded. The classification committee shall affirm or modify the inmate's program, work group, or housing assignment.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 295 through 300.3,530, 532, 646.9, 647, 653m, 2931, 2932, 2933, 4573.6, 5054, 5068, and 12020, Penal Code.

## 3999.1.10. Pelican Bay State Prison - Segregated Program Housing Units.

Special housing units are designated for extended term programming of inmates not suited for general population. Placement into and release from these units requires approval by a classification staff representative (CSR).

(a)    Protective Housing Unit (PHU). An inmate whose safety would be endangered by general population placement may be placed in the PHU providing the following criteria are met:

(1)    The inmate does not require specialized housing for reasons other than protection.

(2)    The inmate does not have a serious psychiatric or medical condition requiring prompt access to hospital care.

(3)   The inmate is not documented as a member or an affiliate of a prison gang.

(4)   The inmates does not pose a threat to the safety or security of other inmates in the PHU.

(5)   The inmates has specific, verified enemies identified on CDC Form 812 likely to and capable of causing the inmate great bodily harm if placed in general population.

(6)   The inmate has notoriety likely to result in great bodily harm to the inmate if placed in general population.

(7)   There is no alternative placement which can ensure the inmate's safety and provide the degree of control required for the inmate.

(8)   It has been verified that the inmate is in present danger of great bodily harm. The inmate's uncorroborated personal report, the nature of the commitment offense or a record of prior protective custody housing shall not be the sole basis for protective housing unit placement.

(b)   Psychiatric Management Unit (PMU). An inmate with a diagnosed psychiatric disorder not requiring inpatient hospital care, whose conduct threatens the safety of the inmate or others, may be housed in a PMU if the inmate is capable of participating in the unit's activities without undue risk to the safety of the inmate or others in the unit.

(c)   Security Housing Unit (SHU). An inmate whose conduct endangers the safety of others or the security of the institution shall be housed in a SHU.

(1)   Assignment criteria. The inmate has been found guilty of an offense for which a determinate term of confinement has been assessed or is deemed to be a threat to the safety of others or the security of the institution.

(2)   Length of SHU Confinement. Assignment to a SHU may be for an indeterminate or for a fixed period of time.

(A)   Indeterminate SHU Segregation.

1.   An inmate assigned to a security housing unit on an indeterminate SHU term shall be reviewed by a classification committee at least every 180 days for consideration of release to the general inmate population. An investigative employee shall not be assigned at these periodic classification committee reviews.

2.   Except as provided at section 3335(a), section 3378(d) and subsection (c)(5), a validated prison gang member or associate is deemed to be a severe threat to the safety of others or the security of the institution and will be placed in a SHU for an indeterminate term.

(B)   Determinate SHU Segregation.

1.   A determinate period of confinement in SHU may be established for an inmate found guilty of a serious offense listed in section 3315 of these regulations. The term shall be established by the Institutional Classification Committee (ICC) using the standards in this section, including the SHU Term Assessment Chart (see section 3341.5(c)(9)), Factors in Mitigation or Aggravation (see section 3341.5(c)(10)), SHU Term Assessment Worksheet CDC Form 629-A, Rev. 3/96, Assessment of Subsequent SHU Term Worksheet CDC Form 629-B, Rev. 9/90, and SHU Time Computation Table (see CDC Form 629-D Rev. 7/88).

2.   The term shall be set at the expected term for the offense in the absence of mitigating or aggravating factors. Deviation from the expected term shall be supported by findings pursuant to subsection (c)(7).

3.   The terms shall be recorded on CDC Form 629-A, SHU Term Assessment Worksheet, using the SHU Time Computation Table which incorporates one-fourth clean conduct credit in the term. The computation shall establish a maximum release date and a

minimum eligible release date (MERD). A copy of the CDC Form 629-A shall be given to the inmate.

4. Serious misconduct while in SHU may result in loss of clean conduct credits or an additional determinate term for an inmate serving a determinate term. Such additional term may be concurrent or consecutive and shall be recorded on CDC Form 629-B with a copy given to the inmate. Such cases shall be referred to a CSR for approval; however, all release and retention requirements of section 3339 shall remain in effect pending CSR approval.

5. Up to 45 days of a SHU inmate's clean conduct credits may be forfeited for disciplinary infractions that are not serious enough to warrant the assessment of a subsequent or concurrent SHU term. Such forfeiture may be assessed against credits already earned or future credits.

6. Consecutive SHU terms shall be assessed only for offenses occurring after commencement of a prior determinate SHU term.

7. The ICC may commute or suspend any portion of a determinate term. Once commuted, the term shall not be reimposed. If suspended, the period of suspension shall not exceed the length of the original term imposed. When either action occurs, the case shall be referred to a classification staff representative (CSR) with a placement recommendation.

8. The Unit Classification Committee shall conduct hearings on all determinate cases at least 30 days prior to their MERD or during the eleventh month from the date of placement, whichever comes first.

(3) Release from SHU. An inmate shall not be retained in SHU beyond the expiration of a determinate term or beyond 11 months, unless the classification committee has determined before such time that continuance in the SHU is required for one of the following reasons:

(A) The inmate has an unexpired MERD from SHU.

(B) Release of the inmate would severely endanger the lives of inmates or staff, the security of the institution, or the integrity of an investigation into suspected criminal activity or serious misconduct.

(C) The inmate has voluntarily requested continued retention in segregation.

(4) A validated prison gang member or associate shall be considered for release from a SHU, as provided above, after the inmate is verified as a gang dropout through a debriefing process.

(5) As provided at section 3378(e), the Departmental Review Board (DRB) may authorize SHU release for prison gang members or associates categorized as inactive. The term inactive means that the inmate has not been involved in gang activity for a minimum of six (6) years. Inmates categorized as inactive who are suitable for SHU release shall be transferred to the general population of a Level IV facility for a period of observation that shall be no greater than 12 months. Upon completion of the period of observation, the inmate shall be housed in a facility commensurate with his or her safety needs. In the absence of safety needs, the inmate shall be housed in a facility consistent with his or her classification score. The DRB is authorized to retain an inactive gang member or associate in a SHU based on the inmate's past or present level of influence in the gang, history of misconduct, history of criminal activity, or other factors indicating that the inmate poses a threat to other inmates or institutional security.

(6) As provided at section 3378(f), an inmate categorized as inactive and placed in the general population may be returned to segregation based upon one reliable source item

identifying the inmate as an active gang member or associate. The procedures described in this Article shall be utilized for the removal of the inmate from the general population, the review of the initial segregation order, and all periodic reviews of the indeterminate SHU term.

(7)  Determinate SHU terms shall only be served in a departmentally approved SHU or a facility specifically designated for that purpose.

(8)  When an inmate is paroled while serving a determinate term, the remaining time on the term is automatically suspended. When an inmate returns to prison, either as a parole violator or with a new prison commitment, ICC shall evaluate the case for reimposition of the suspended determinate term. If reimposed, the term shall not exceed the time remaining on the term at the time of parole.

(9)  SHU Term Assessment Chart (fixing of determinate confinement to SHU).

| OFFENSE | | TYPICAL TERM (Mos) Low | Expected | High |
|---|---|---|---|---|
| (A) | Homicide: | | | |
| 1. | Murder, attempted murder, solicitation of murder, or voluntary manslaughter of a non-inmate. | (36 | 48 | 60) |
| 2. | Murder, attempted murder, solicitation of murder, or voluntary manslaughter of an inmate. | (15 | 26 | 36) |
| (B) | Violence Against Persons: | | | |
| 1. | Assault on a non-inmate with a weapon or physical force capable of causing mortal or serious injury. | (09 | 28 | 48) |
| 2. | Assault on an inmate with a weapon or physical force capable of causing mortal or serious injury. | (06 | 15 | 24) |
| 3. | Assault on a non-inmate with physical force insufficient to cause serious injury. | (06 | 12 | 18) |
| 4. | Assault on an inmate with physical force insufficient to cause serious injury. | (02 | 03 | 06) |
| 5. | Throwing a caustic substance on a non-inmate. | (02 | 03 | 04) |
| (C) | Threat to Kill or Assault Persons: | | | |
| 1. | Use of non-inmate as hostage. | (18 | 27 | 36) |
| 2. | Threat to a non-inmate. | (02 | 05 | 09) |
| 3. | Threat to an inmate. | (02 | 03 | 04) |
| (D) | Possession of a Weapon: | | | |
| 1. | Possession of a firearm or explosive device. | (18 | 27 | 36) |
| 2. | Possession of a weapon, other than a firearm or explosive device which has been manufactured or modified so as to have the obvious intent or capability of inflicting traumatic injury, and which is under the immediate or identifiable control of the inmate. | (06 | 10 | 15) |
| (E) | Trafficking in Drugs: Distributing controlled substances in an institution or camp or causing controlled substances to be brought into an institution or camp for the purpose of distribution. | (06 | 09 | 12) |
| (F) | Escape With Force or Attempted Escape with Force. | (09 | 16 | 24) |
| (G) | Disturbance, Riot, or Strike: | | | |
| 1. | Leading a disturbance, riot, or strike. | (06 | 12 | 18) |
| 2. | Active participation in, or attempting to cause conditions likely to threaten institution security. | (02 | 04 | 06) |
| (H) | Harassment of another person, group, or entity either directly or indirectly through the use of the mail or other means. | (06 | 12 | 18) |
| (I) | Arson, Theft, Destruction of Property: Theft or destruction of State property where the loss or potential loss exceeds $10,000 or threatens the safety of others. | (02 | 08 | 12) |
| (J) | Extortion and Bribery: extortion or bribery of a non-inmate. | (02 | 06 | 09) |
| (K) | Except as otherwise specified in this section, proven attempts to commit any of the above listed offenses shall receive one-half (1/2) of the term specified for that offense. | | | |

(L)     Any inmate who conspires to commit any of the
        offenses above shall receive the term specified
        for that offense.

(10) Factors in mitigation or aggravation of SHU term. The SHU term shall be set at the expected range unless a classification committee finds factors exist which warrant the imposition of a lesser or greater period of confinement. The total period of confinement assessed shall be no less than nor greater than the lowest or highest months listed for the offense in the SHU Term Assessment Chart. In setting the term, the committee shall determine the base offense. If the term being assessed includes multiple offenses, the offense which provides for the longest period of confinement shall be the base offense. Lesser offenses may be used to increase the period beyond expected term. After determining the base offense, the committee shall review the circumstances of the disciplinary offense and the inmate's institutional behavior history using the factors below. The committee shall then determine that either no unusual factors exist or find that specific aggravating or mitigating factors do exist and specify a greater or lesser term. The reasons for deviation from the expected term shall be documented on a CDC 128-G, Classification Chrono, and SHU Term Assessment Worksheet, a copy of which shall be provided to the inmate.

(A)  Factors in Mitigation.
1.   The inmate has a minor or no prior disciplinary history.
2.   The inmate has not been involved in prior acts of the same or of a similar nature.
3.   The misconduct was situational and spontaneous as opposed to planned in nature.
4.   The inmate was influenced by others to commit the offense.
5.   The misconduct resulted, in part, from the inmate's fear for safety.
(B)  Factors in Aggravation.
1.   The inmate's prior disciplinary record includes acts of misconduct of the same or similar nature.
2.   The misconduct was planned and executed as opposed to situational or spontaneous.
3.   The misconduct for which a SHU term is being assessed resulted in a finding of guilty for more than one offense.
4.   The inmate influenced others to commit serious disciplinary infractions during the time of the offense.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 530, 532, 646.9, 653m, 932, 5054 and 5068, Penal Code.


## 3999.1.11. Pelican Bay State Prison - Inmate Custody Designations.

(a)  Designation of a degree of an inmate's custody shall be reasonably related to legitimate penological interests. The CDC uses the following inmate custody to establish where an inmate shall be housed and assigned, and the level of staff supervision to ensure institutional security and public safety:
**Maximum Custody**
**Close A Custody**
**Close B Custody**
**Medium A Custody**
**Medium B Custody**
**Minimum A Custody**
**Minimum B Custody**
(1)  Maximum Custody.

(A)  Housing shall be in segregated program housing unit as described in CCR section 3335 and CCR subsections 3341.5(b) and 3341.5(c).

(B)  Assignments and activities shall be within the confines of the approved segregated program housing unit.

(C)  An inmate designated as Maximum Custody shall be under the direct supervision and control of custody staff.

(2)  Close A Custody Male Inmates.

(A)  Housing shall be in cells within Level III and Level IV facilities in housing units located within an established facility security perimeter.

(B)  Close A Custody inmates shall be permitted to participate in program assignments and scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter.  Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting.  Close A Custody inmates are not permitted beyond the work change area.

(C)  Custody staff supervision shall be direct and constant.  In addition to regular institutional counts, Close A Custody male inmates shall be counted at noon each day.

(3)  Close A Custody Female Inmates.

(A)  Housing shall be in cells or in a designated Close Custody dormitory.

(B)  Close A Custody female inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter and the work change area.  Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting.

(C)  Custody staff supervision shall be direct and constant.  In addition to regular institutional counts, Close A Custody female inmates shall be counted at noon each day.

(4)  Close B Custody Male Inmates.

(A)  Housing shall be in cells within designated institutions in housing units located within an established facility security perimeter.

(B)  Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, Level III or Level IV institution. Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

(C)  The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D)  Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(5)  Close B Custody Female Inmates.

(A)  Housing shall be in cells or in a designated Close Custody dormitory located within an established facility security perimeter.

(B) Close B Custody female inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter, including beyond the work change area, in designated Level II, Level III and Level IV institutions. Close B Custody female inmates may participate in work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody female inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in an assigned housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(6) Medium A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter.

(C) Custody staff shall provide frequent and direct supervision.

(7) Medium B Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter. Inmates may be given daytime assignments outside the facility security perimeter but must remain on facility grounds.

(C) Custody staff shall provide frequent and direct supervision inside the facility security perimeter. Custody staff shall provide direct and constant supervision outside the facility security perimeter.

(8) Minimum A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities may be inside or outside the facility security perimeter.

(C) Staff supervision shall consist of at least hourly observation if assigned outside the facility security perimeter. Sufficient staff supervision of the inmate shall be provided to ensure the inmate is present if assigned inside the facility security perimeter.

(9) Minimum B Custody.

(A) Housing may be in cells or dormitories on facility grounds, in a camp, in a Minimum Support Facility (MSF) or in a community based facility such as a Community Correctional Facility.

(B) Assignments and activities include eligibility work or program assignments located either on or off institutional grounds.

(C) Sufficient staff supervision shall be provided to ensure the inmate is present.

(b) An "R" suffix shall be affixed by a classification committee to the inmate's custody designation to alert staff of inmates who have a history of specific sex offenses.

(1) The "R" suffix shall be designated for any inmate who has been found guilty in a disciplinary hearing for, was convicted of, or whose commitment offense includes an act equivalent to any Penal Code 290 offenses, including, but not limited to the following offenses:

(A) Assault with intent to commit rape, sodomy, oral copulation, rape in concert with another, lascivious acts upon a child, or penetration of genitals or anus with a foreign object. [Penal Code section 220]

(B) Rape.

(C)  Rape of spouse.
(D)  Rape or penetration of genitals or anal openings by foreign object; acting in concert by force or violence.
(E)  Abduction to live in an illicit relationship.
(F)  Incest.
(G)  Sodomy.
(H)  Sexually assaulting an animal.
(I)  Lewd or lascivious acts with a child under 14.
(J)  Oral copulation.
(K)  Penetration of genital or anal openings by foreign object.
(L)  Indecent exposure.
(M)  Sexual disorderly conduct.

(2)  Within six months upon reception of an inmate with a record of arrest or detention for any offenses listed in section 3377.1(b)(1), a classification committee shall determine the need for an "R" suffix to the inmate's custody designation. The committee shall consider the arrest reports and district attorney's comments related to each arrest.

(3)  If a unit classification committee (UCC) finds that an inmate may no longer require an "R" suffix, the committee shall refer the matter to the Institution Classification Committee (ICC) for action.

(4)  An inmate whose "R" suffix has been removed shall be eligible for any housing or assignment for which they otherwise would qualify had the "R" suffix never been designated.

(5)  When an "R" suffix has been considered and not applied, or has been removed at one facility, another facility shall not affix an "R" suffix. If the facility disagrees with the "R" removal or decision against "R" designation, it shall submit the case for a Departmental Review Board decision.

(c)  An "S" suffix may be affixed by a classification committee to the inmate's custody designation to alert staff of an inmate's need for single cell housing. The classification committee's decision to affix the "S" suffix shall be based on documented evidence that the inmate may not be safely housed in a double cell or dormitory situation based on a recommendation by custody staff or a health care clinician.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code.

# EXHIBIT  C

PELICAN BAY STATE PRISON                                    Page 1
Operational Procedure No. 233                         November 2004
Management of Indecent Exposure

# Date:  November 1, 2004

## CALIFORNIA DEPARTMENT OF CORRECTIONS
### Pelican Bay State Prison
### Crescent City, California  95532

**November 2004**

**I.    PLAN NUMBER AND TITLE:**

Operational Procedure No. 233
Operational Procedure Title:  Management of Indecent Exposure Incidents

**II.    PURPOSE AND OBJECTIVE:**

A.    The purpose of this Operational Procedure (OP) is to provide a plan for correctional staff to effectively manage inmates who commit sexual disorderly conduct and indecent exposure violations.

B    To provide support from the institution for employees who observe indecent exposure or sexual disorderly conduct incidents.

C.    To establish identification, reporting, tracking, monitoring, managing, disciplining, and prosecuting referral criteria of inmate indecent exposure incident (IEI) and sexual disorderly conduct offenses.

D.    To familiarize staff with the reporting requirements and behavior management methods designed to decrease the opportunity for the inmate to repeat the behavior and/or to minimize the impact the behavior has on institution staff.

**III.    REFERENCES:**

A.    California Code of Regulations (CCR), Title 15 Revisions, Sections 3000, 3315, 3377.1, and 3341.5.

B.    Department Operations Manual (DOM), Section 62010.4.3.1.4.

C.    Penal Code (PC) Section 314 and 647.

D.    CDO Minutes – 12/11/01, 03/26/02, and 06/30/03.

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 2
November 2004

  E.  Diagnostic and Statistic Manual of Mental Disorders, Fourth Edition.

  F.  Instructional Memorandum/Pilot Project, Pelican Bay State Prison (PBSP).

**IV. APPROVAL AND REVIEW:**

This procedure will be reviewed and updated annually by the Associate Warden (AW), Health Care Operations (HCO), and forwarded to the Warden for final approval.

**V. RESPONSIBILITIES:**

  A.  The AW, HCO, has overall responsibility, having daily functional responsibility, for proper implementation of the plan.

  B.  The Facility Captains and Correctional Captains are responsible for compliance in their respective area of responsibility.

  C.  Correctional Lieutenants and Correctional Sergeants are directly responsible for the daily implementation of this OP and for ensuring subordinate staff are trained in the policy and procedure of IEI's.

  D.  It is the responsibility of all staff to familiarize themselves and comply with the policy and procedures of IEI.

**VI. POLICY:**

  A.  IEI's will not be tolerated. Indecent exposure is the willful and lewd exposure of a person, or the private parts thereof, in any place where there are present other persons to be offended or annoyed thereby. An IEI may be the result of a conduct problem. IEI's can also be the result of a mental illness. Every IEI shall be reported, tracked, managed, disciplined, and referred for prosecution as set forth in this procedure. An inmate who indecently exposes himself shall be subject to a variety of security measures in an attempt to eliminate the behavior and/or reduce the opportunity to repeat an IEI.

  B.  Employees who observe an IEI shall be provided support from the institution. This may include the Employee Assistance Program (EAP), The Employee Post Trauma Program (EPTP), and Required Reporting Employee Indecent Exposure Report. (Attachment A)

OP 233.BC (11222004)

## VII.   METHODS:

A.   Whenever an inmate commits indecent exposure or sexual disorderly conduct, steps will be taken in an attempt to stop the behavior and reduce future occurrences:

1.   Definition:

a.   Indecent Exposure means every person who willfully and lewdly, either; 1) Exposes their person, or the private parts thereof, in any public place, or in any place where there are other persons present to be offended or annoyed thereby; or 2) Procures, counsels, or assists any person so to expose themselves or take part in any model artist exhibition, or to make any other exhibition of themselves in public view, or the view of any number of person, such as is offensive to decency, or is adapted to excite to vicious or lewd thoughts or acts.

b.   Sexual Disorderly Conduct means every person who touches his genitals or buttocks in a manner, or other circumstance of this touching, that demonstrates it is for the purpose of sexual arousal, gratification, annoyance, or offense, and that any reasonable person would conclude this conduct would be offensive.

2.   Reporting:

a.   Staff members do not have the option of ignoring such misconduct. At the minimum, it is a Division D offense, and must be documented as such. If the inmate has no prior criminal convictions for either PC Section 314 or 288, this does not include PC Section 288a, the inmate should be charged with the Division D offense of Indecent Exposure. If the inmate has prior criminal convictions for PC Section 314 or 288, the inmate will be charged with the Division B offense of Indecent Exposure with Priors.

b.   An inmate who masturbates in public without exposing his genitals, for example under his clothing, is in violation of PC Section 647. The inmate will be charged with the Division E offense of Sexual Disorderly Conduct.

c.   Crime/Incident Report, California Department of Corrections (CDC) 837:

(1)   All Indecent Exposure and Sexual Disorderly Conduct shall be

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 4
November 2004

reported as an incident on the CDC 837-A and Attachments Part B, Involved Parties, and Part C, Supplement. This incident package will be processed according to standard institution procedures with a copy sent to the Madrid Compliance Unit. All IEIs shall be evaluated for referral to the Del Norte District Attorney. Upon the second Division D indecent exposure offense in a one-year period, the IEI shall be referred to the District Attorney for evaluation for prosecution.

(2)    Ensure the CDC 837-A clearly identifies, in the conclusion section, whether the offender is charged with a Division B or D offense.

(3)    Ensure supervisory staff assesses, implements, and discusses with reporting employee appropriate security precautions.

(4)    Ensure the reporting employee is provided with the opportunity to complete a Required Reporting Employee Indecent Exposure Report and submit the report to the Use of Force Compliance Unit, within 48 hours of the offense. This report and the CDC 837 will be evaluated quarterly at the Indecent Exposure Review Committee (IERC).

(5)    Ensure the reporting employee is offered EPTP, EAP, and that the Employee Post Trauma Tracking sheet is completed by the Incident Commander/Supervisor, and forwarded to the Watch Office. (Attachment B)

(6)    The Court Liaison Officer will refer reported offenses to the District Attorney consistent with the Pelican Bay State Prison Memorandum of Understanding.

d.    CDC Form 115, Rules Violation Report (RVR):

(1)    Every IEI shall be documented by the observing employee on a CDC Form 115, RVR.

(2)    Sexual Disorderly Conduct:

Any disciplinary for Sexual Disorderly Conduct related to sexual misconduct must have two elements:

<u>1.</u>    Evidence the inmate touched his genitals or buttocks.

OP 233.BC (11222004)

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 5<br>November 2004

        2. Evidence the manner or other circumstances of this touching, show it was for the purpose of sexual arousal, gratification, annoyance, or offense, since there is no privacy in an institution.

    (3) Indecent Exposure Elements:

        (a) To expose his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed.

        (b) To procure, counsel, or assist any person so to expose himself to take part in any model artist exhibition, or to make any other exhibition of himself to public view, or the view of any number of persons, such as is offensive to decency or is adapted to excite to vicious or lewd thoughts or actions.

    (4) Inmate clerks shall not be utilized in the preparation/typing of IEI related CDC 115 documents.

c. Mental Health Referral and Evaluation:

    (1) An IEI may be the result of a conduct problem or mental illness.

        (a) Conduct Problems:

        Some inmates expose themselves solely to cause affront and alarm, disrupt institution operations, offend staff, sexual gratification, or because of illegal drug use.

        (b) Mental Illness:

        Some inmates expose themselves because of a mental disorder.

    (2) An inmate who engages in indecent exposure shall receive a mental health screening. At the same time, custody will implement security precautions as described in this OP.

    (3) Offenders who are already enrolled in the Mental Health Services Delivery System (MHSDS) will have the issue addressed by the Mental Health Interdisciplinary Treatment Team (IDTT). The

OP 233.BC (11222004)

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 6
November 2004

        IDTT may recommend specific behavioral security precautions, in addition to appropriate adjustments to medications and/or other therapeutic interventions, in an effort to reduce the behavior.

    (4)    Those inmates who are found, on the basis of the mental health screening assessment, to have a condition which warrants entry into the MHSDS will be placed in the appropriate program. Inmates diagnosed with exhibitionism and not with a major mental health illness will be placed in the MHSDS under the medical necessity designation.

    (5)    Those inmates who are not entered into the MHSDS after the mental health screening, will receive ongoing review and intervention, if indicated, from the mental health professional who serves on the IERC, or designee.

    (6)    Although mental health treatment will be offered to inmates diagnosed with a mental disorder, including exhibitionism, the inmate must agree to participate voluntarily. There are no legal means to coerce participation in treatment for exhibitionism.

  d.    District Attorney Referrals:

    (1)    The IERC shall prepare written standards for District Attorney referrals of IEI's for approval by the Warden.

    (2)    The IERC shall, no less than semiannually, publish a status report concerning IEI cases referred to the District Attorney, a copy of which shall be provided to the Warden and the District Attorney.

3.    Tracking:

  a.    Indecent Exposure Offender Tracking Memorandum:

    (1)    The Facility Captains shall be responsible for identifying all IEI offenders within their assigned area using the Automated Disciplinary Management System (ADMS) tracking system. Documentation and tracking are distributed on a monthly basis to supervisors, Mental Health Management, and unit staff.

    (2)    The committee assigned to monitor this process will be the IERC. This committee will meet no less than quarterly. It is comprised of administrative staff at the level of Associate Warden, Chief or

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 7
November 2004

Senior Psychiatrist, and Chief or Senior Psychologist, Custodial Management, Litigation Coordinator, and a Recorder, who will prepare minutes from the meeting. The IERC will monitor the impact of environmental modifications and clinical programs using the tracking reports, incident reports, and the Required Reporting Employee Indecent Exposure Report.

4. Disciplinary Sanctions:

Inmates found guilty of committing an IEI offense and identified as an indecent exposure offender, may be subject to privilege losses including canteen, appliances, annual package, and/or Family Visiting.

a. First offense violation may result in loss of any or all of the following for up to 90 days:

(1) Loss of canteen.

(2) Loss of appliances (televisions, cassette players, CD players, radios).

(3) Annual packages.

(4) Telephone privileges.

(5) Loss of personal property.

b. Second offense violations may result in loss of any or all of the following for up to 180 days:

(1) Loss of canteen.

(2) Loss of appliances.

(3) Annual packages.

(4) Telephone privileges.

(5) Loss of personal property.

c. Recent changes to the visiting regulations require visiting restrictions for an inmate found guilty in a disciplinary hearing for indecent exposure. If a minor was involved in the IEI, a classification committee must review

OP 233.BC (11222004)

PELICAN BAY STATE PRISON                                           Page 8
Operational Procedure No. 233                                  November 2004
Management of Indecent Exposure

for visiting restrictions with minors.

d.    Family Visiting Restrictions:

Per the CCR, Title 15, Section 3177 (b) (1), an inmate convicted of
PC Section 314 is precluded from any family visiting.  The CCR, Title
15, Section (b) (1), requires a criminal conviction for PC 314 by a court
of law.  The CCR, Title 15, Section 3177 (b) (1) (A), states the inmate
may be restricted from family visiting even without a criminal
conviction, so long as there is substantial evidence of such misconduct.
Per the CCR, Title 15, Section 3177 (b) (1) (A), substantial evidence
includes a guilty finding on a disciplinary report.  Therefore, a guilty
finding for Indecent Exposure may prohibit the inmate from family
visiting.  This prohibition is not for a specific period of time.  It may be
permanent.  This restriction on family visiting is not a penalty imposed
by the Senior Hearing Officer (SHO) as part of the disciplinary
disposition; a classification committee may impose this restriction when
family visiting is reviewed.  In the hearing summary, it is sufficient the
SHO note the inmate has been found guilty of an offense listed under the
CCR, Title 15, Section 3177 (b) (1) (A), as prohibiting family visiting.

The following AutoText entry will be added to the SHO's Disposition
Summary of the CDC 115 Report, under the name Family Visiting.  This
will be documented in the Additional Penalties section:  *Per CCR
3177(b) (1) (A), this inmate has been found guilty of an offense listed in
the CCR 3177(b) (1).  This inmate should be reviewed for prohibition
against all future family visits.*

5.    Security Precautions and Restrictions:

a.    Security precautions are measures taken specifically when supervising or
working with Level IV General Population (GP) and segregated inmates,
to assist and alert correctional employees to prevent or identify
previously documented behavior that has proven to be a threat to other
inmates, staff, and institutional security and safety.

b.    There are two kinds of security measures; precautions and restrictions.
Security precautions are not used as a punishment and should not be
confused with disciplinary restrictions.  Security restrictions are applied
as a result of a disciplinary action where inmates are afforded due
process.

c.    Security precautions are implemented by Correctional Officers/Sergeants
and approved, tracked, and reviewed by the Facility Captain/Lieutenant

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

weekly. In the Psychiatric Services Unit (PSU), Security Housing Unit (SHU), and Administrative Segregation Units (ASU), these precautions are reviewed weekly by the IDTT as appropriate.

6.   Overview of Available Security Precautions:

   a.   The following are some of the tools available as security precautions to manage indecent exposure behavior:

      (1)   Temporary restriction from yard or other settings which may provide a venue for the behavior.

      (2)   Use of an exposure control jumpsuit to limit the ability of the inmate to engage in the behavior.

      (3)   Solid door with placard, cell and/or side window covering, or other devices to limit the ability of the inmate to be observed while engaging in the behavior.

      (4)   Substitution of activity setting to reduce the possibility of the behavior impacting staff, i.e. concrete yard substituted for regular yard setting.

      (5)   Notify staff via the   Indecent Exposure Offender Tracking Memorandum.

   b.   Upon the first offense, the inmate is identified on the Indecent Exposure Offender Tracking Memorandum.

   c.   Offense out of cell:

   Immediately remove inmate from area and return to cell.

      (1)   PSU:

         (a)   Cover cell with bright colored (yellow) Lexan/placard.

         (b)   First Offense: No yard for 10 days, then 60 days concrete yard.

         (c)   Second Offense: No yard for 10 days, then 120 days concrete yard. Exposure control jumpsuit optional.

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 10
November 2004

    (2)   GP:

        (a)   All offenses:  move to cell with solid door, partially cover cell with bright colored (yellow) placard.  ASU placement may also be appropriate for an inmate who would otherwise be housed behind a solid door in GP if a solid door is unavailable.

        (b)   Yard restrictions are outlined in ASU1 and ASU2 yard restrictions.

    (3)   ASU1:

        (a)   All offenses: Place bright colored (yellow ) placard on cell door.

        (b)   No yard for 10 days then exposure control jumpsuit.

    (4)   ASU2:

        (a)   All offenses: cover cell with bright colored (yellow) Lexan.

        (b)   No yard for 10 days then exposure control jumpsuit.

    (5)   SHU:

        (a)   Cover cell with bright colored (yellow) Lexan.

        (b)   No yard for 10 days then exposure control jumpsuit.

d.      Offense in-cell or to Control Booth:

    (1)   PSU:

        (a)   Cover cell with bright colored (yellow) Lexan.

        (b)   30 days concrete yard.

    (2)   GP:

        Move to solid door cell front and identify with yellow placard on cell windows.  ASU placement may also be appropriate for

OP 233.BC (11222004)

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 11
November 2004

an inmate who would otherwise be housed behind a solid door in GP if a solid door is unavailable.

(3)  ASU1:

Place bright colored (yellow) placard on cell door.

(4)  ASU2:

Cover cell with bright colored (yellow) Lexan.

(5)  SHU:

Cover cell with bright colored (yellow) Lexan.

e.  Offense in PSU Group:

(1)  Immediately remove inmate from group and return to cell.

(2)  Cover cell with bright colored (yellow) Lexan.

(3)  Refer to IDTT where, on a case-by-case basis, IDTT/clinical staff may temporarily restrict the inmate from group activity. Exposure control jumpsuit status upon return to group for 30 days with IDTT review and approval.

(4)  All security precautions are reviewed weekly with the IDTT.

(5)  Any group suspension for EOP level of care inmates requires clinical staff authorization.

f.  Environmental Modification:

(1)  Modified Lexan/Placard Cell Front:

Bright yellow Lexan/placard cell fronts are used to alert staff of inmates that commit indecent exposure offenses. Bright colors also provide control booth officers better visibility, while providing staff coverage, i.e., dark colors of staff uniforms against a light background. The cell front covering reduces the inmate's ability to re-offend.

(2)  Environmental modifications are a proposed ongoing project and

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 12
November 2004

subject to revision.

(3)   The application, review, and removal of the bright colored (yellow) Lexan/placard cell fronts and indecent control jumpsuits will be as follows:

(a)   Application:

1.   The placement of yellow Lexan/placard is mandatory for all indecent exposure offenses as a security precaution. The reporting employee may initiate this security precaution by submitting a Security Precaution Chrono, CDC 128-B (Attachments D1, D2, D3, and D4). If a CDC 128-B is not submitted by the reporting employee, the Incident Commander is responsible to ensure that yellow Lexan is placed on the inmate's cell front by the following business day and that a CDC 128-B is completed.

2.   The placement of an inmate onto exposure control jumpsuit status is optional for all in-cell IEI's as a security precaution. The placement of an inmate onto exposure control jumpsuit status is mandatory for all out of cell IEI's as a security precaution in PSU, SHU and ASU. An employee may initiate this security precaution by submitting a CDC 128-B. If security precautions expire, specifically the indecent exposure jumpsuit, employees may implement for a shift without supervisor approval. Indecent exposure jumpsuits and yellow Lexan cell fronts are not to be used in the GP. If the reporting employee in the SHU, ASU1, or ASU2, does not submit a CDC 128-B, the Incident Commander is responsible to ensure that a CDC 128-B is completed.

(b)   Removal:

The assigned Facility Captain, in consultation with the mental health IDTT as appropriate, may remove or extend security precautions based on overall case factors and institutional security needs. The decision to remove or extend security precautions shall be documented by both the Facility Captain and the IDTT as appropriate. Under normal circumstances, security precautions for initial IE offenses will be implemented for a period of 90 days with a review by the

Facility Captain, in consultation with the mental health IDTT as appropriate, in 60 days. This review should consider the possible reduction or extension of the imposed security precautions. Every subsequent IEI shall, under normal circumstances, be subject to the security precaution to be implemented for a period of six months. Should a precaution be extended, another CDC 128-B will be completed documenting the reason for the extension.

    (c)    Review:

The assigned Facility Captain, in consultation with the mental health IDTT as appropriate, should review security precautions on a weekly basis. This review is to be documented on a CDC 128-B and signed by the Correctional Captain/Lieutenant.

7.    Classification:

    a.    Upon the first IEI offense in a one-year period, a GP inmate will be moved to solid door cell with a yellow placard. ASU placement may also be appropriate for an inmate who would otherwise be housed behind a solid door in GP if a solid door is unavailable.

    b.    Special or security housing units are designed for extended term programming of inmates not suited for GP placement. Placement into and release from these units requires the approval by a Classification Staff Representative. An inmate whose conduct endangers the safety of others, or the security of the institution, shall be housed in the SHU. The inmate has to be found guilty of an offense for which a determinate term of confinement has been assessed, or is deemed to be a threat to the safety of others, or the security of the institution. A determinate period of confinement in the SHU may be established for an inmate when found guilty of two or more IEI offenses in a one year period.

Upon the second offense in a one year period (indecent exposure), all the security precautions/restrictions are available as discussed with the first incident. However, upon the second offense, the indecent exposure offender will be evaluated by ICC for a SHU term consistent with CCR 15, section 3341.5(9)(H), Harassment of another person, group, or entity either directly or indirectly through the use of mail or other means. The low term is 6 months, expected term 12 months, and the aggravated high term is 18 months.

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

Page 14
November 2004

The available security precautions, including all privilege losses up to 180 days has proven to significantly reduce indecent exposure incidents. Therefore, when ICC's are reviewing and assessing a SHU term for this offense, committee members are to consider and encouraged to suspend the first SHU term with the remaining disciplinary and/or security precautions in place for a six-month period. The totality of the inmate's case factors, including length of time incarcerated, disciplinary, work, education, laudatory, and programming history, as well as the circumstances of the incident, are to be evaluated when imposing a SHU term.

c.  Each ASU inmate will be seen by the ICC within ten days of receipt in the unit, and under the provisions of the CCR, Title 15, Section 3338 (a).

d.  ICC shall review the inmate upon completion of the Indecent Exposure CDC 115 for a SHU term assessment consistent with the SHU schedule for indecent exposure, per the PBSP Pilot Program Instructional Memorandum.

e.  Upon the second IEI in a one year period, ICC shall affix the "R" suffix. The purpose for applying an "R" suffix is to assist staff in identifying inmates with a history of specific sex offenses and to limit the inmate's opportunity to escape or reoffend while in custody, per the PBSP Pilot Program Instructional Memorandum.

f.  The assigned Correctional Counselor will document the "R" suffix designation on the Reclassification Score Sheet CDC 840 (Attachment E). The "R" suffix will not be affixed to the custody designation until the completion of the disciplinary process unless the inmate is already eligible for the "R" suffix placement.

8.  Training:

a.  Custody Training:

Structured meaningful orientation shall be provided to all staff until the Management of Inmate Indecent Exposure Lesson Plan is finalized and approved for use by the Correctional Peace Officers Standards and Training Office.

PELICAN BAY STATE PRISON
Operational Procedure No. 233
Management of Indecent Exposure

    b.    Clinical Staff Training:

        Mental Health Services staff will receive mandatory training on diagnostic criteria, clinical evaluation procedures, behavioral measures, and appropriate treatment strategies.

9.    All staff are encouraged to make IEI policy and procedure recommendations to their supervisors at any time. Written recommendations shall be submitted to the employee's supervisor, who shall forward the recommendations to the IERC. The IEI policy and procedure may be updated to incorporate any changes adopted by management.

_____      _____

RICHARD J. KIRKLAND        Date
Warden

Attachment A:    Required Reporting Employee Indecent Exposure Report
Attachment B:    Employee Post Trauma Tracking Sheet
Attachment C:    Indecent Exposure Offender Monthly Tracking Memorandum
Attachment D1:  CDC 128-B Security Precautions/Restrictions Chrono ASU
Attachment D2:  CDC 128-B Security Precautions/Restrictions Chrono SHU
Attachment D3:  CDC 128-B Security Precautions/Restrictions Chrono GP
Attachment D4:  CDC 128-B Security Precautions/Restrictions Chrono PSU/THU
Attachment E:    CDC 840 Reclassification Score Sheet

Contact Person:   Associate Warden, HCO

# EXHIBIT  D

# Lesson Plan
## *Management of Inmate Indecent Exposure*



PELICAN BAY
STATE PRISON

| | |
|---|---|
| **Course Title:** | Management of Inmate Indecent Exposure Incidents (IEI) |
| **Audience:** | Correctional Staff |
| **Date Prepared** | March 2004 |
| **Author:** | |
| **Max. No. of Students** | 35 |
| **Hours of Instruction:** | 2 hours |
| **Prerequisite Courses:** | None |
| **Facility:** | In-Service Training Classroom |
| **Number of Recommended Instructional Staff:** | 2 |
| **Instructional Resources:** | Lesson Plan, Management of Inmate Indecent Exposure |
| **Recommended Instructor Qualifications:** | Presentation skills, subject matter expertise Correctional and Clinical Supervisory Staff |
| **Materials Needed by Student:** | Notebook and pencil/pen |
| **Method for Evaluating Training Effectiveness:** | Student evaluation |
| **Reference:** | CCR 15; PC 314; CDO Minutes – 12/11/01, 03/26/02, 06/30/03; – Diagnostic & Statistic Manual of Mental Disorders, Fourth Edition |
| **Instructional Goal:** | At the end of this class, staff will know how to identify the three general types of Indecent Exposure (IE). Staff will understand motivations of the IE offender, Mental Health (MH) aspects to IE behavior, custodial disciplinary elements, and sanctions, and how to effectively respond to the employee(s). |

Revised 03/19/04

# Lesson Overview

**Learning Outcome:** You will know how to identify the three general types of Indecent Exposure (IE) and understand motivations of the IE offender, mental health aspects to IE behavior, security measures, disciplinary elements, and sanctions.

### Performance Objectives

| | |
|---|---|
| 1. Mental Health Aspects | You will be able to identify the mental health components of indecent exposure. |
| 2. Employee | You will be able to respond and provide tools to the correctional employee. |
| 3. Disciplinary Aspect | You will understand the reporting requirements and the difference between a Division B or D offense. |
| 4. Security Measures | You will be able to identify and implement the available security precautions and disciplinary restrictions. |
| 5. Tracking and Monitoring | You will be able to identify and track IE offenders. You will be able to use the Automated Disciplinary Management System (ADMS) to monitor offender housing and offenses. |

## Definition: Penal Code 314 - Indecent Exposure:

Every person who willfully and lewdly, either:

1. Exposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby; or

2. Procures, counsels, or assists any person so to expose himself or take part in any model artist exhibition, or to make any other exhibition of himself in public view, or the view of any number of persons, such as is offensive to decency, or is adapted to excite to vicious or lewd thoughts or acts, is guilty of a misdemeanor.

## Mental Health Aspects of Indecent Exposure and Exhibitionism:

1. It is important for staff to talk openly about inmate incidents of indecent exposure, including their personal reactions to it.

2. Males who expose themselves most commonly target females, but they also target males.

3. Indecent exposure can be characterized by three broad categories:

   a. Those for whom the behavior is a direct result of a major serious mental disorder. Example include: schizophrenia, the manic phase of bipolar disorder, brain damage

Revised 02/18/04

("organic brain syndrome"), the direct result of illicit drug intoxication such as methamphetamine.

    b.  Those who can be diagnosed with a psychiatric disorder called "Exhibitionism."

    c.  Those for whom indecent exposure is purely antisocial behavior.

4.  Aspects of each type of indecent exposure will be discussed.


## Mental Health Referral and Evaluation:

1.  An inmate who engages in indecent exposure shall receive a mental health screening. At the same time, custody will implement security precautions as described below.

2.  Offenders who are already enrolled in the Mental Health Services Delivery System (MHSDS) will have this issue addressed by the mental health Interdisciplinary Treatment Team (IDTT). The IDTT may recommend specific behavioral security precautions, in addition to appropriate adjustments to medications and/or other therapeutic interventions, in an effort to reduce the behavior.

3.  Those inmates who are found, on the basis of the mental health screening assessment, to have a condition which warrants entry into the MHSDS, including for Exhibitionism, will be placed in the appropriate program if not already enrolled.

4.  Those inmates who are not entered into the MHSDS after the MH screening evaluation, will receive ongoing oversight (and intervention if indicated) from the mental health professionals who serve on the Indecent Exposure Review Committee (see "Monitoring Committee" below).

5.  Although mental health treatment will be offered to inmates diagnosed with a serious mental disorder or Exhibitionism, the inmate must agree to participate voluntarily. There are no legal means to coerce participation.

## Teaching Points for Supervisory Staff When Responding to Employees:

1.  Explain the importance of listening to the employees and validating their concerns.

2.  Understand that employees may have difficulties in discussing, with peers or supervisors, an inmate's indecent exposure and/or their personal feelings about being offended.

3.  Explain the need to complete the required Reporting Employee Indecent Exposure Report. Supervisors should ensure that they discuss with the employee any recommendations and/or concerns noted in this report. The discussion, as well as any action taken because of the discussion, should be documented on the supervisory comment line.

4.  Emphasize that traumatic reactions are normal.

Revised 02/18/04

5.   Encouraging staff to mentally prepare for encounters of this type.

6.   Explain the importance of reacting to the inmate engaged in indecent exposure as little as possible, to avoid reinforcing the behavior. (This does not preclude reporting the offense via Incident Report (CDC Form 837), talking with supervisory staff or taking security precautions.)

7.   Informing the employee of available security precautions and/or disciplinary sanctions.

8.   Inform the employee of the availability of the Employee Assistance Program and the Employee Post Trauma Program.

9.   Emphasize the need to follow-up with employee.

**Disciplinary and Criminal Sanctions:**

If an inmate deliberately exposes his genitals to a staff member under circumstances likely to cause affront, this is INDECENT EXPOSURE. If the inmate has no prior criminal convictions for either the California Penal Code (PC) Section 314 or 288 (this does not include PC Section 288a), the inmate should be charged with the Division D offense of INDECENT EXPOSURE. If the inmate has any prior criminal convictions for PC Section 314 or 288, the inmate should be charged with the Division B offense of INDECENT EXPOSURE WITH PRIORS.

Private masturbation is not an offense. Masturbation is an offense only when it is public. If a masturbating inmate exposes his genitals, publicly, deliberately and under conditions likely to cause affront, this is INDECENT EXPOSURE. Staff members do not have the option of ignoring such misconduct. At minimum, it is a Division D offense, and must be documented as such.

An inmate might masturbate in public without exposing his genitals (for example, under his clothing). This is a violation of PC Section 647. The inmate will be charged with the Division E offense of DISORDERLY CONDUCT.

INDECENT EXPOSURE, INDECENT EXPOSURE WITH PRIORS, and DISORDERLY CONDUCT must be documented with a CDC Form 837 Incident Report.

**DISORDERLY CONDUCT:**

Any disciplinary for disorderly conduct elated to sexual misconduct must have two elements:

- First – Evidence that the inmate touched his genitals or buttocks, and
- Second – evidence that the manner, or other circumstances of this touching, shows that it was for the purpose of sexual arousal, gratification, annoyance, or offense.

Revised 02/18/04

The Penal Code offense requires a third element: It must be in a public place where any reasonable person would anticipate that this conduct might offend someone. This third element is not an issue in prison.

## REPORTING REQUIREMENTS:

- Ensure that all reported offenses are referred to the District Attorney consistent with the Pelican Bay State Prison MOU.
- Ensure that the CDC 837(A) clearly identifies whether the offender is charged with a Division "B" or "D" Indecent Exposure offense. In order for the offense to qualify for a Division "B" offense the inmate must have a prior conviction for PC 314 or 288.
- Ensure that supervisory staff assess and implement (with Reporting Employee input) appropriate security precautions.
- Ensure that the Reporting Employee is provided with the opportunity to complete a Reporting Employee Indecent Exposure Report and submit the report to the Incident Analysis Unit (IAU) within 48 hours of the offense. This report and the CDC Form 837 will be evaluated quarterly at the Indecent Exposure Review Committee (IERC).
- Inmates found guilty of committing an IE offense and identified as an Indecent Exposure Offender, may be subject to privilege losses including canteen, appliances, annual package, and/or Family Visiting.

## VISITING RESTRICTIONS WITH MINORS:

Recent changes to the visiting regulations require visiting restrictions for an inmate found guilty in a disciplinary hearing for Indecent Exposure. If a minor was involved in the Indecent Exposure incident, a classification committee must review for visiting restrictions with minors.

Family Visiting Restrictions: Per CCR 3177(b) (1), an inmate convicted of PC 314, Indecent Exposure is precluded from any family visiting. CCR 3177(b) (1) requires a criminal conviction for PC 314, Indecent Exposure, by a court of law. CCR 3177(b)(1)(A) states that the inmate may be restricted from family visiting even without a criminal conviction so long as there is substantial evidence of such misconduct. Per CCR 3177(b) (1) (A), substantial evidence includes a guilty finding on a disciplinary report. Therefore, a guilty finding for INDECENT EXPOSURE may prohibit the inmate from family visiting. This prohibition is not for a specific period of time. It may be permanent. This restriction on family visiting is not a penalty imposed by the Senior Hearing Officer (SHO) as part of the disciplinary disposition; a classification committee imposes this restriction when family-visiting eligibility is reviewed. In the hearing summary, it is sufficient that the SHO note that the inmate has been found guilty of an offense listed under CCR 3177 (b) (1) (A) as prohibiting family visiting. The following AutoText entry will be added under the name *Family Visiting* under *Additional Penalties: Per CCR 3177(b) (1) (A), this inmate has been found guilty of an offense listed in CCR 3177(b) (1). This inmate should be reviewed for prohibition against all future family visits*

## SECURITY PRECAUTIONS AND RESTRICTIONS:

Page 5

Security precautions are measures taken specifically when supervising or working with Level IV General Population (GP) and segregated inmates, to assist and alert correctional employees to prevent or identify previously documented behavior that has proven to be a threat to other inmates, staff, and institutional security and safety. Security precautions are tools consistently used by staff for a determinate period to prevent, curtail, and identify the threatening behavior. Security precautions procedures for the Security Housing Unit (SHU) are found in Operational Procedure (OP) 222. Security Precautions procedures for the Psychiatric Services Unit (PSU) are found in OP 223.

Security precautions are implemented by Correctional Officers/Sergeants and approved, tracked, and reviewed by Facility Captain/Lieutenant weekly. In PSU SHU, and Administrative Segregation Units (ASU) these precautions are reviewed weekly by the IDTT as appropriate. Security precautions are not used as a punishment or to be confused with disciplinary restrictions. Security restrictions are applied as a result of a disciplinary action and afford an inmate due process. The following are some of the tools available as Security Precautions to manage Indecent Exposure behavior:

- Upon the first offense, inmate is identified on quarterly IE List.

- <u>Offense</u> out of cell (***Immediately remove I/M from yard and return to cell***)
  - PSU – Cover cell with bright colored (yellow) Lexan. First offense: No yard for 10 days, then 6 0 d ays c oncrete y ard. S econd o ffense, no yard for 10 days, then 120 days concrete yard (***Exposure control jumpsuit, optional***).
  - GP – All offenses: House in Administration Segregation (ASU) and cover cell with bright colored (yellow) Lexan or placement of bright colored (yellow) placard on cell door. Yard restriction as outlined in ASU1 and ASU2 yard restrictions.
  - ASU1 – All offenses: Place bright colored (yellow) placard on cell door. No yard 10 days then exposure control jumpsuit.
  - ASU2 – All offenses: Cover cell with bright colored (yellow) Lexan. No yard 10 days then exposure control jumpsuit.

- <u>Offense</u> out of cell (***Immediately remove I/M from yard and return to cell***) (***continued***)
  - SHU – Cover cell with bright colored (yellow) Lexan. First offense: No yard 10 days then exposure control jumpsuit while on yard, and cover yard window for the first 30 days of yard. Second offense, no yard 10 days, then exposure control jumpsuit while in the yard, and cover yard window while exposure control jumpsuit is required.

- <u>Offense in cell or to Control Booth</u>
  - PSU, –Cover cell with bright colored (yellow) Lexan and 30 days concrete yard.
  - GP – House in ASU and cover cell with bright colored (yellow) Lexan.
  - ASU1 – Place bright colored (yellow) placard on cell door.
  - ASU2 – Cover cell with bright colored (yellow) Lexan.
  - SHU – Cover cell with bright colored (yellow) Lexan.

Revised 02/18/04

  ◆    Offense in PSU Group (*Immediately remove I/M from group and return to cell.*)
- First offense: Refer to IDTT, recommend 30-day suspension.  Second offense: Refer to IDTT, recommend 60-day suspension.
- Cover cell with bright colored (yellow) Lexan.
- First offense: Exposure control jumpsuit upon return for 30 days with IDTT review and approval.  Second offense: Exposure control jump suit upon return for 60 days.
- All security precautions are reviewed weekly with the IDTT.
- Any group suspension for EOP level of care inmates requires clinical staff Authorization

## Overview of Available Security Precautions:

1.    IEC Jumpsuit (show photos or actual jumpsuit)
2.    Cell fronts covered with bright yellow colored Lexan.
3.    Concrete Yards (PSU)
4.    SHU – Cover Yard windows.
5.    "R" suffix evaluation and application: refer to classification via CDC 128B1.
6.    Notify staff via monthly tracking memorandum of indecent exposure offenders.

## Environmental Modification:

Environmental modifications are a proposed on-going project and subject to revision.

    **Modified Lexan cell front** –Bright yellow cell fronts are used to alert staff of inmates that commit Indecent Exposure offenses Bright colors also provide Control Booth Officers better visibility, while providing staff coverage (i.e. dark colors of staff uniforms against a light background).

The primary criminal element and intent of the IE offender is to cause affront and alarm.  The rudimentary goal of the aforementioned environmental modification is to reduce the offender's opportunity to achieve their goal.  In most cases, the IE offender wants to be able to see staff in order to cause offense to the staff member.  If the offender cannot visually observe staff, they cannot or will not perform the act of exposing or masturbating.  The secondary goal of the yellow Lexan is to alert staff of the propensity to IE, therefore providing staff with options before responding to the cell front.

## The Application, Review, and Removal of the Bright Colored (Yellow) Lexan Cell Fronts and Indecent Control Jumpsuits Will Be As Follow:

## Application:

The placement of yellow Lexan is mandatory for all IE offenses as a security precaution.  The reporting employee may initiate this security precaution by submitting a CDC-128-B SECURITY PRECAUTION CHRONO.  If a CDC-128-B SECURITY PRECAUTION CHRONO is not submitted by the reporting employee, the Incident Commander is responsible to ensure that

Page 7

yellow Lexan is placed on the inmate's cell front by the following business day and that a CDC-128-B SECURITY PRECAUTION CHRONO is completed.

The placement of an inmate into an exposure control jumpsuit is optional for all IE out-of-cell offenses as a security precaution in PSU. The placement of an inmate into an exposure control jumpsuit is mandatory for all IE out of cell offenses as a security precaution in SHU and ASU. The reporting employee may initiate this security precaution by submitting a CDC-128-B SECURITY PRECAUTION CHRONO. If the reporting employee in the SHU ASU1, or ASU2 does not submit a CDC-128-B SECURITY PRECAUTION CHRONO, the Incident Commander is responsible to ensure that a CDC-128-B SECURITY PRECAUTION CHRONO is completed.

## Removal:

The assigned Facility Captain in consultation with the mental health IDTT as appropriate, may remove or extend security precautions based on overall case factors and institutional security needs. The decision to remove or extend security precautions shall be documented by both the Facility Captain and the IDTT. Under normal circumstances, security precautions for initial IE offenses will be implemented for a period of 90 days, with a review by the Facility Captain, in consultation with the mental health IDTT, in 60 days. This review should consider the possible reduction or extension of the imposed security precautions. Every subsequent IE offense shall, under normal circumstances, be subject to the security precaution to be implemented for a period of six months.

## Review:

The assigned Facility Captain, in consultation with the mental health IDTT as appropriate, should review security precautions on a weekly basis. This review is to be documented on the Facility's Precaution/Restriction form and signed by the Correctional Lieutenant/Captain.

## Identification/Tracking Key Indicators:

The Facility Captain in every unit shall be responsible for identifying all IE offenders within their assigned area using the ADMS Tracking System. Documentation and tracking will be distributed on a quarterly basis to custodial supervisors, the Indecent Exposure Review Committee, Mental Health Management, and unit staff. Tracking includes the number of inmates, the number of IE incidents, and where the offenses occurred.

## Monitoring Committee:

The committee assigned to monitor this process will be the Indecent Exposure Review Committee. This committee will meet no less than quarterly. It is comprised of administrative staff at the level of Associate Warden, Chief or Senior Psychiatrist and Chief or Senior Psychologist, Custodial Management, Litigation Coordinator, and a Recorder who will prepare minutes from the meeting. The Warden may invite representatives from employee bargaining

Revised 02/18/04

units if he, in his discretion, believes their participation will be beneficial to the monitoring process and that their presence does not compromise inmate medical/mental health privacy rights. The IERC will monitor the impact of environmental modifications and clinical programs using the tracking reports, Incident Reports, and the Reporting Employee Indecent Exposure Report.

***This concludes the training on Management of Inmate Indecent Exposure. Do you have any questions?***

Answering questions.

Conduct student evaluation.

**(Note: Any additions, deletions or changes to this lesson plan requires approval of the Warden.)**

Revised 02/18/04

# EXHIBIT  E

FILED

2004 JUL 16 AM 11:07

RICHARD W. WIEKING
U.S. CLERK
NO. DISTRICT COURT
DIST OF CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DEANNA L. FREITAG,

    Plaintiff,

v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS, et al.,

    Defendants.

NO. C00-2278 TEH

ORDER ADOPTING SPECIAL
MASTER'S FINAL REPORT
AND RECOMMENDATIONS
RE: INMATE EXHIBITIONIST
MASTURBATION

United States District Court
For the Northern District of California

        Following a jury verdict finding that Defendant California Department of Corrections

("CDC") violated Plaintiff Deanna Freitag's rights under Title VII and that certain individual

Defendants retaliated against Freitag in violation of 42 U.S.C. § 1983, this Court granted in

part and denied in part Freitag's motion for injunctive relief on August 18, 2003. The Court

granted the motion in part by enjoining officials at Pelican Bay State Prison ("PBSP") from

committing further violations of Title VII. Aug. 18, 2003 Order at 8. The Court denied

Freitag's remaining requests for equitable relief and found it prudent to refer the case to

Special Master John Hagar and the *Madrid v. Gomez* team for "development of a remedial

plan to address the problem of inmate exhibitionist masturbation" at PBSP. *Id.* at 9-10. On

May 14, 2004, the Special Master filed his final report and recommendations on this issue.

The CDC filed the only set of objections to this report.[1] Having considered the Special

Master's report, the CDC's objections, and oral arguments of counsel heard on July 12, 2004,

the Court now issues this injunctive order as additional equitable relief to Plaintiff Freitag for

Defendant CDC's violations of Title VII.

---

[1] The parties were given ten business days to file objections. Counsel for the CDC
faxed objections to the Special Master on May 28, 2004, the last day of the ten-day period.
The Court subsequently filed these objections on June 7, 2004. For any future reports,
counsel are hereby instructed that objections to final reports by the Special Master must be
filed with the Court, and not merely faxed or otherwise delivered to the Special Master.

1    **DISCUSSION**

2    It is obvious from the Special Master's report that development of the remedial plan in

3    this case has not been easy or straightforward.  However, the end result appears to be a

4    workable plan that has been narrowly designed to remedy the Title VII violations found in

5    this case while, at the same time, protecting the inmate rights implicated by the plan.  The

6    Court has carefully reviewed the Special Master's final report and finds it to be well-

7    reasoned and supported by the record.  While the Court finds merit to a few of the CDC's

8    objections, all of which are discussed in turn below, the Court finds good cause to adopt the

9    vast majority of the Special Master's report and recommendations.

10

11   **Scope of the Remedy**

12   The CDC first objects to the scope of the Special Master's recommendations as

13   extending beyond the Court's authority to remediate Title VII violations.  However, as the

14   Court explained when it granted in part and denied in part Freitag's motion for injunctive

15   relief:

16   Title VII bestows on district courts broad equitable powers to
     fashion remedial orders to redress the effects of past violations.
17   *Bouman v. Block*, 940 F.2d 1211, 1233 (9th Cir. 1991); *see
     EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1578 (7th Cir.
18   1997) (explaining that Title VII grants district courts wide
     discretion to enjoin proven acts of employment discrimination).
19       . . .

20   Title VII is remedial legislation that should be liberally
     construed in favor of victims of unlawful employment practices.
21   *Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994); *see Bowe v.
     Colgate-Palmolive Co.*, 416 F.2d 711, 721 (7th Cir. 1969) (noting
22   that Title VII's grant of remedial authority should be interpreted
     broadly and applied in such a way that effectively eradicates the
23   illegal conduct and makes the victim whole).

24   Aug. 18, 2003 Order at 2-4.  To the extent that the CDC objects to the Court's authority to

25   issue injunctive relief at all, the Court rejects this objection for the reasons stated in its earlier

26   order.  *Id.* at 4-6 (discussing Freitag's entitlement to injunctive relief).  Similarly, the Court

27   rejects the nonsensical suggestion by CDC's counsel at oral argument that the Court's

28

United States District Court
For the Northern District of California

1  remedial powers under Title VII are somehow diminished because "only" a statutory right,

2  and not a constitutional right, is at stake.

3      The CDC also objects to the inclusion of a mental health component to the remedial

4  plan, but the CDC's objections on this issue are unpersuasive. First, the Court rejects any

5  assertion by the CDC that the proposed remedial plan would compromise the security of

6  PBSP or the safety of its staff. In addition, it is undisputed that inmate exhibitionism

7  contributed to the creation of the hostile work environment at issue in this case, and it is

8  equally undisputed that some inmates expose themselves because of mental illness. Thus, the

9  Court agrees with the Special Master's conclusion that the problem of inmate exhibitionist

10 masturbation, and therefore the Title VII violations found to exist at PBSP, "will not be

11 solved, at least concerning some portion of the offenders, unless [the offenders] are screened

12 (to determine if the exhibitionism is caused by a mental illness) and treated (to prevent or

13 delay recidivism of future exhibitionism to staff)." Final Report at 9. Upon review of the

14 proposed plan – which Defendants themselves developed in conjunction with Dr. Jeffrey

15 Metzner, a Court-appointed expert – the Court further agrees with the Special Master that the

16 proposed plan has been "carefully tailored to correct the Title VII problem that is at issue in

17 this case, and not to do more." *Id.* at 10. As the Special Master observed, "Defendants have

18 agreed to treat this disorder in the context of *Freitag* because Exhibitionist related treatment

19 (curbing or controlling indecent exposure *at the prison*) is needed for an adequate and

20 complete Title VII remedy." *Id.* at 16. By including mental health screening and treatment

21 for exhibitionism as part of the remedial plan in this case, the Court does not hold that

22 inmates have a right to such treatment under the Eighth Amendment. To the contrary, as

23 carefully explained in the Special Master's report, such services are required to remedy the

24 Title VII violations found by the jury in this case.

25      At oral argument, the CDC asserted that the goals of the proposed plan could be

26 achieved by voluntary implementation. Thus, the CDC urged the Court to exclude the

27 proposed plan from any injunctive relief ordered by the Court and instead engage in a period

28

United States District Court
For the Northern District of California

3

of "watchful waiting." The Court soundly rejects this proposal. As the Court explained

when it granted in part and denied in part Freitag's original motion for injunctive relief:

> [The] CDC has offered no evidence to suggest that it will
> effectively respond to the sexually hostile work environment
> created by inmate exhibitionist masturbation at Pelican Bay or
> that it will adequately address concerns employees have about the
> inmates' misconduct. CDC has, at every stage of this litigation,
> insisted that its actions do not constitute violations of Title VII,
> even going so far as to blame Plaintiff for the treatment she
> received. Under the circumstances, there is a distinct possibility
> that CDC's unlawful employment practices can and will persist.
> Accordingly, injunctive relief is needed to prohibit CDC from
> continuing to tolerate a sexually hostile work environment at
> Pelican Bay and to ensure that it no longer retaliates against
> officers who speak out against the illegality.

Aug. 18, 2003 Order at 7-8 (citations and footnote omitted). Although the CDC apparently

asserts that it now has had a change of heart and is willing to implement a remedial plan

voluntarily, the Court finds such representations to be too little, too late. Again, as this Court

earlier explained:

> At this point, an admission of some degree of liability by CDC
> and a promise to comply with Title VII would be inadequate to
> preclude the entry of a remedial order, as "'protestations of
> repentance and reform timed to anticipate or blunt the force of a
> lawsuit offer insufficient assurance' that the practice sought to be
> enjoined will not be repeated."

*Id.* at 7-8 n.3 (citations omitted). The inadequacy of the CDC's "watchful waiting" proposal

is further underscored by the Department's continuing protestations that it cannot control

inmate behavior, and by its repeated argument that it should not be held liable because

Freitag could have avoided the hostile work environment at PBSP if only she would have

agreed to a transfer.

In short, given the Court's broad remedial powers under Title VII, its belief that an

injunctive order is required to remedy the Title VII violations found by the jury, and its

agreement with the Special Master that the proposed plan is necessary and has been narrowly

tailored to remedy the Title VII violations, the Court rejects the CDC's objections to the

scope of the proposed remedial plan. Assessment and treatment of inmates in the limited

fashion discussed in the Special Master's report and accompanying exhibits is not only an

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

1  appropriate part of the Court's injunctive relief; it is a necessary part without which the

2  remedial plan cannot succeed.

3

4  **Involvement of *Madrid* and *Freitag* Counsel in Monitoring Compliance**

5       The CDC next "objects to the recommended involvement of Freitag's lawyers and

6  *Madrid* counsel in the monitoring of the Department's implementation of any policies

7  ordered by way of a remedial plan in *Freitag*." CDC Objections at 4. This objection is

8  unprecedented and unfounded. The CDC apparently believes that only its counsel, along

9  with the Special Master, are entitled to participate in the monitoring of the remedial plan in

10  this case. Such one-sided involvement of counsel would be improper.

11       As an initial matter, the CDC cites no precedent for barring a plaintiff's counsel from

12  monitoring an injunction that remedies violation of that plaintiff's rights. Moreover, the

13  CDC's arguments for doing so in this case are unpersuasive. First, the CDC has failed to

14  convince the Court that the remedial plan will violate inmates' due process or privacy rights

15  or the Health Insurance Portability and Accountability Act. Any individual mental health

16  information that might be revealed to counsel in this case will be extremely minimal. The

17  plan does not, for example, contemplate sharing inmates' mental health files or other detailed

18  treatment information with counsel. Moreover, to the extent that any inmate mental health

19  information is revealed, it will be covered by the stipulation and protective order entered by

20  the Court on January 6, 2004. Given that all information produced by Defendants during the

21  remedial process in this case is confidential and subject to the protective order, the Court

22  does not find the potential inclusion of minimal information regarding inmate mental health

23  to be grounds for excluding Freitag's counsel from the monitoring process.[2] If the protective

24  order does not alleviate the CDC's concerns over inmate privacy, then the CDC is free to

25  apply for a modification of the protective order, Protective Order at 3, or to meet and confer

26

27       [2]Notably, *Madrid* counsel, who competently represent PBSP inmates as a class and are
responsible for safeguarding inmates' rights, have not objected to the participation of
28  Freitag's lawyers in monitoring the remedial plan. This further persuades the Court that
there is no serious risk that the plan will violate inmates' medical privacy rights.

5

United States District Court
For the Northern District of California

1  with counsel and the Special Master to seek a slight modification of the remedial plan so that,

2  to the extent possible, individual inmate information would be redacted.

3       The protective order also addresses the CDC's objection regarding use of information

4  obtained during the remedial process by counsel for Freitag in the ongoing *Berndt* litigation.

5  The protective order specifically provides that, "All confidential material shall be used solely

6  in connection with the above-captioned action and not for any other purpose, *including other*

7  *litigation*, without agreement of the parties and order of the Court." *Id.* (emphasis added).

8  Thus, Freitag's counsel is barred by stipulation and court order from using any confidentially

9  acquired information in the *Berndt* litigation either directly or indirectly.

10       Next, the CDC suggests that the CCPOA (California Correctional Peace Officers

11  Association) would be better suited to monitor implementation of the remedial plan than

12  Freitag's counsel. This Court disagrees. The CCPOA has done nothing to protect the rights

13  of Deanna Freitag in this case; instead, Freitag relied on outside counsel to obtain a jury

14  verdict finding the CDC liable for violation of her Title VII rights. Accordingly, the Court

15  agrees with the Special Master that Freitag's counsel are in a better position to keep the

16  Special Master informed of any correctional officer concerns (and, in particular, those of

17  Plaintiff Freitag, the person for whom this injunction is being fashioned) regarding the

18  implementation of the remedial plan. In response to the CDC's objection regarding the

19  combined hourly billing rate of Ms. Price and Mr. Burris, the Court notes that counsel cannot

20  recover for duplicative tasks; therefore, the CDC will not have to pay $950.00 per hour for

21  any work done by Freitag's counsel.

22       The CDC also objects to the participation of *Madrid* counsel in this case because it

23  contends that *Madrid* counsel has adequate opportunity to monitor the treatment of inmates

24  under the *Madrid* remedial plan. Again, the Court disagrees. The *Madrid* plan does not

25  cover inmate exhibitionist masturbation, nor does it extend beyond inmates' Eighth

26  Amendment rights. As the Special Master's report makes clear, the proposed remedial plan

27  in this case does not stem from a finding that the Eighth Amendment requires generalized sex

28  offender treatment, and monitoring this case only within the context of *Madrid* would

6

United States District Court
For the Northern District of California

1 therefore be insufficient. Nonetheless, the Court agrees that the participation of *Madrid*

2 counsel in monitoring the remedial plan in this case is important. The plan involves both

3 inmate rights and employee rights, and all parties agree that these rights may at times raise

4 competing interests. Consequently, the Court finds it necessary to include counsel for both

5 inmates and employees in the remedial process so that both sets of rights are adequately

6 protected.

7       Finally, the CDC objects specifically to counsel's involvement in monitoring the

8 CDC's efforts to obtain CPOST certification for its lesson plan for inmate indecent exposure

9 and to establish a training schedule for related classes. This objection is unfounded. Counsel

10 for the CDC argue that all monitoring by counsel should cease "once the training goal and

11 program content have been established." CDC Objections at 5. However, establishing goals

12 and program content are only initial steps in the remedial process. Regardless of whether or

13 when the training program is certified by CPOST, the Special Master and counsel must

14 continue to monitor the CDC's progress in implementing the remedial plan, as well as

15 monitoring the effectiveness of that plan in practice.

16

17 **Dual Captioning**

18       The Court agrees with the CDC's objections regarding the dual captioning of this

19 order with both the *Freitag* and *Madrid* captions. Although the Special Master

20 recommended that the Court issue this order with both captions, he suggested that the Court

21 should consider dual captioning very carefully given the different rights that each case is

22 designed to protect. Having done so, the Court concludes that the better option is to file this

23 order only under the *Freitag* caption, while at the same time ordering that the Clerk of the

24 Court serve copies of this order on all counsel in *Madrid* so that they are aware of their right

25 to participate in the monitoring process. Adopting this approach alleviates both the CDC's

26 concerns regarding dual captioning and the *Madrid* plaintiffs' concern that they be allowed to

27 participate in the remedial process.

28

United States District Court
For the Northern District of California

**Notice to Inmates**

1

2       The CDC's final set of objections concerns the posting of information in the prison

3  library, as recommended by the Special Master. However, in making its written objections,

4  the CDC failed to consider the standard practices used in *Madrid*. Similarly, when

5  specifically asked at oral argument why the Court should deviate from the *Madrid* practices

6  in this case, counsel for the CDC completely sidestepped the issue and merely repeated,

7  sometimes verbatim, its written objections. For the past nine years, all PBSP medical and

8  mental health programs have been available in the prison library to inmates under *Madrid*.

9  Similarly, the posting process in *Madrid* has not been restricted solely to orders by this Court;

10  to the contrary, it has included, among other types of documents, drafts of the Special

11  Master's reports, objections by counsel, use of force procedures, and policies and practices

12  relating to medical care. As the Special Master explained at the July 12, 2004 hearing, no

13  security compromises or other problems have arisen from posting material in the prison

14  library under *Madrid*, and none of the fears expressed in the CDC's objections has ever

15  materialized. The Court is therefore unconvinced that the *Madrid* standard practices should

16  be abandoned in this case.

17       Moreover, the remedial plan includes significant changes to the way in which PBSP

18  staff and officials respond to incidents of inmate exhibitionist masturbation. As a result, the

19  Court agrees with the Special Master that PBSP inmates should be notified of these changes,

20  and that knowledge of the new range of sanctions may even assist prison officials in

21  implementing the remedial plan. The Court further agrees that there is no legitimate purpose

22  achieved by hiding the process by which this remedial order was developed – including the

23  initial order in which this Court found it appropriate to refer the case to the Special Master

24  and *Madrid* team and the Special Master's draft report and objections thereto.

25       However, the CDC has raised three objections with which the Court agrees. First,

26  consistent with the *Madrid* practices, Exhibit 5 to the Special Master's final report should be

27  redacted to exclude any inmate names. Second, pages 43-46 of Exhibit 12 should be

28  excluded from posting. These pages of SHU Operational Procedure 222 have been marked

8

United States District Court
For the Northern District of California

1   as confidential from inmates, and the Court finds that legitimate security concerns warrant

2   these pages' exclusion from posting in the prison library.  Finally, the Court finds that

3   legitimate security concerns also warrant redacting the "Security Housing Unit Emergency

4   Response Team and Equipment Inventory" page from Exhibit 13.

5       There do not appear to be any legitimate security concerns to posting the other

6   documents attached to the Special Master's report.  Accordingly, subject to further review by

7   the PBSP Warden and *Madrid* compliance unit in conjunction with the Special Master, all

8   other exhibits to the Special Master's final report should be posted in full, along with a copy

9   of the Special Master's report, this order, and the August 18, 2003 order establishing the

10  reasons for implementing a remedial plan in this case.

11

12  **CONCLUSION**

13      In accordance with the above discussion, and with good cause appearing, IT IS

14  HEREBY ORDERED that:

15

16      1.  The Special Master's May 14, 2004 Final Report Re: Adequacy of Pelican Bay

17  State Prison Remedial Plan Re: Inmate Exhibitionist Masturbation is adopted in full, except

18  to the extent that it recommends that this order bear both the *Freitag* and *Madrid* captions

19  and that all exhibits to the report be posted in the prison library without redaction.

20

21      2.  This order will be filed only with the *Freitag* caption.  However, counsel in

22  *Madrid* shall be permitted to participate in monitoring the remedial plan in this case.  To

23  provide notice to the *Madrid* parties, the Clerk shall serve this order on all counsel in

24  *Madrid*.

25

26      3.  The Court hereby adopts Defendants' "Pelican Bay State Prison Plan for the

27  Management of Indecent Exposure Incidents" (Exhibit 6 to the Special Master's final report),

28  the "Required Reporting Employee Indecent Exposure Report" (Exhibit 7), the "Procedure

1  for Clinical Assessment of Inmate Indecent Exposure by the Mental Health Department"

2  (Exhibit 8), and the "Mental Health Treatment for Inmates Diagnosed with Exhibitionism

3  Who Have Engaged in Indecent Exposure Incidents" (Exhibit 9) as the remedial plan for the

4  management of sexually exhibitionist inmates.

5

6      4.   Defendants shall implement the plan immediately, including the implementation

7  of a related Title 15 inmate exhibitionist masturbation pilot project at PBSP.

8

9      5.   Defendants shall submit to the Special Master, within 30 calendar days of the date

10  of this order, proposed policies and procedures, including but not limited to the Title 15 pilot

11  project policies, relating to losses of privileges for indecent exposure, including but not

12  limited to policies relating to time credit loss, loss of commissary, use of lexan doors

13  (including the time periods for this restriction), and use of indecent exposure jump suits.  To

14  the extent practical, the parties to this action and the *Madrid* case shall be permitted to

15  participate in this process.

16

17      6.   Defendants shall obtain CPOST certification in a timely fashion for an adequate

18  training program to be provided to all PBSP employees with regular contact with inmates,

19  including nursing staff, consistent with their need to coordinate several elements of remedial

20  plan implementation.  The Special Master shall monitor Defendants' progress in obtaining

21  CPOST certification and shall work with PBSP officials to establish an adequate training

22  schedule for such classes.  To the extent practical, the parties to this action and the *Madrid*

23  case shall be permitted to participate in this process.

24

25      7.   Defendants shall submit to the Special Master, within 30 calendar days of the date

26  of this order, a proposed notice to the inmates of PBSP concerning the inmate exhibitionism

27  remedial plan and its Title 15 pilot project components.  To the extent practical, the parties to

28  this action and the *Madrid* case shall be permitted to participate in this process.  This order,

10

United States District Court
For the Northern District of California

1    the Court's August 18, 2003 order, and the Special Master's Report and Recommendations
2    filed on May 14, 2004, shall be made available in their entirety, except as noted in this order,
3    to inmates in the prison law libraries within 30 calendar days of the date of this order.   The
4    Warden of PBSP and the *Madrid* compliance unit shall carefully review the exhibits to the
5    Special Master's report and bring any security-related concerns to the Special Master's
6    attention within 15 calendar days of the date of this order.  If agreement cannot be reached
7    concerning the exclusion of exhibits for security-based reasons, Defendants may petition the
8    Court for further relief.
9
10        8.   The Special Master shall monitor the effectiveness, in practice, of Defendants'
11   remedial plan as follows:
12        (a)   Defendants shall provide the Special Master with the minutes of each
13   Indecent Exposure Review Committee ("IERC") meeting, and all reports utilized for
14   discussion at the IERC, including but not limited to (1) the 115 status reports related to
15   indecent exposure from the Automated Disciplinary Management System, (2) the Mental
16   Health Screen, Assessment, and Treatment computer report, (3) the IERC Review of
17   Indecent Exposure Incidents, and (4) the incident reports prepared by staff that are
18   summarized for the IERC summary report.
19        (b)   The Special Master shall meet and confer as necessary with the Warden of
20   PBSP and all appropriate mental health clinicians to assess the effectiveness of the remedial
21   plan.  The Special Master shall also travel on-site to PBSP to attend IERC meetings, observe
22   training sessions, inspect housing units, and interview inmates and/or staff as necessary to
23   assess the effectiveness of the remedial plan.
24
25        9.   Counsel for Freitag, counsel for the *Madrid* class, and counsel for the defendants
26   in *Freitag* and *Madrid* shall monitor the effectiveness, in practice, of the remedial plan as
27   follows:
28

1    (a) Defendants should provide all counsel with the minutes of each IERC

2  meeting, and all reports utilized for discussion at the IERC, including but not limited to

3  (1) the 115 status reports related to indecent exposure from the Automated Disciplinary

4  Management System, (2) the Mental Health Screen, Assessment, and Treatment computer

5  report, (3) the IERC Review of Indecent Exposure Incidents, and (4) the incident reports

6  prepared by staff that are summarized for the IERC summary report. This document

7  production shall be subject to the provisions of the stipulated protective order in this case.

8    (b) Counsel and the Special Master shall meet and confer with the IERC through

9  video conference at the Office of the Attorney General once per quarter for the first year of

10  monitoring, and twice per year thereafter, to discuss the status of the remedial plan as well as

11  specific cases and/or issues. In addition, if questions or problems arise between quarterly

12  meetings, counsel for the parties may request information through the Office of the Special

13  Master, similar to the manner in which remedial plan problems are addressed between "30-

14  day" *Madrid* meetings at PBSP.

15

16    10. Defendants shall not modify the "Pelican Bay State Prison Plan for the

17  Management of Indecent Exposure Incidents" (Exhibit 6 to the Special Master's final report),

18  the "Required Reporting Employee Indecent Exposure Report" (Exhibit 7), the "Procedure

19  for Clinical Assessment of Inmate Indecent Exposure by the Mental Health Department"

20  (Exhibit 8), or the "Mental Health Treatment for Inmates Diagnosed with Exhibitionism Who

21  Have Engaged in Indecent Exposure Incidents" (Exhibit 9), unless the modification is made

22  pursuant to the following procedure:

23    (a) Defendants shall submit a copy of the proposed revised policy or document to

24  the Special Master, with a copy to Freitag's counsel and counsel for the *Madrid* class, at least

25  14 calendar days prior to the effective date of the proposed changes. If there is a bona fide

26  emergency, this time period may be reduced by an appropriate amount, but in no event shall

27  the revised policy or document be submitted to the Special Master later than its effective

28  date.

United States District Court
For the Northern District of California

1       (b)  If the Special Master determines that the proposed modification conflicts with

2  any of the Court's orders, he shall work with Defendants to reconcile the conflict.

3       (c)  If reconciliation is not possible, the Special Master shall file a report with the

4  Court that sets forth his findings as to why Defendants' proposed modification violates this

5  Court's orders.  He shall also make recommendations as to what actions should be taken

6  concerning the proposed modification.

7

8  **IT IS SO ORDERED.**

9

10  DATED  7/15/04

11                    THELTON E. HENDERSON, JUDGE
                             UNITED STATES DISTRICT COURT

United States District Court
For the Northern District of California

13

rbe

United States District Court
for the
Northern District of California
July 16, 2004


* * CERTIFICATE OF SERVICE * *


Case Number:3:00-cv-02278


Freitag

    vs

CDC

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on  July 16, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

    Pamela Y. Price, Esq.
    Price and Associates PLC
    1617 Clay Street
    Oakland, CA  94612

    John L. Burris, Esq.
    Law Offices of John L. Burris
    7677 Oakport Street, Suite 1120
    Oakland, CA  94621

    Richard L. Manford, Esq.
    Attorney General's Office
    1300 I. Street, Room 125
    P.O. Box 944255
    Sacramento, CA  94244-2550


Richard W. Wieking, Clerk

BY: _____
    Deputy Clerk

rbe

United States District Court
for the
Northern District of California
July 16, 2004


\* \* CERTIFICATE OF SERVICE \* \*


Case Number:3:90-cv-03094


Madrid

   vs

Dept Of Corrections

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on  July 16, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

     John Hagar
     2040 Polk St
     P.O. Box 314
     San Francisco, CA  94109

     Sara Turner, Esq.
     CA State Attorney General's Office
     455 Golden Gate Ave
     Suite 11000
     San Francisco, CA  94102-7004

     Donald Specter, Esq.
     Prison Law Office
     General Delivery
     San Quentin, CA  94964

     Steven Fama, Esq.
     Prison Law Office
     General Delivery
     San Quentin, CA  94964


Richard W. Wieking, Clerk

BY: _____
    Deputy Clerk

# EXHIBIT F

State of California

# Memorandum

Date : October 5, 2004

To : All Inmates

From : Department of Corrections
Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA 95532-7000

Subject : MANAGEMENT OF INDECENT EXPOSURE INCIDENTS AT PELICAN BAY STATE PRISON

Pelican Bay State Prison has established a program to manage and reduce indecent exposure incidents. Indecent exposure is the deliberate and lewd exposure of genitals or masturbation under circumstances likely to offend or annoy another person.

Under the current program, all Indecent Exposure/Disorderly Conduct incidents are reported and tracked. This program also includes the application of security precautions for inmates who commit an indecent exposure offense, segregated placement, and disciplinary consequences for inmates found guilty of rules violations for such offenses, including possible referral to the district attorney for formal criminal prosecution. This program also provides for mental health screening of inmates who engage in indecent exposure and, in appropriate cases, the offering of mental health treatment.

The following security precautions are currently being used and may be assessed to inmates committing these violations:

SECURITY PRECAUTIONS (Instituted immediately after any act of indecent exposure and reviewed periodically to determine continued necessity.)
- Bright yellow placard/Lexan cell front and cell front window covering
- Indecent Exposure Control Jumpsuit
- Yard Restriction

It is anticipated that Pelican Bay State Prison will receive authorization in the near future to implement a pilot project to address the management of indecent exposure incidents. Some of the projected components of this plan include adverse classification action, as well as increased privilege loss through the disciplinary process.

For example, under the pilot project, inmates found guilty of committing indecent exposure offenses may be subject to the following:

CLASSIFICATION
First offense violation may result in the following adverse classification actions:
- Retention in segregation
- Assessment of an "R" Suffix

PRIVILEGE LOSS
First offense violation may result in loss of any or all of the following for up to 90 days each.
Second offense violations may result in loss of any or all of the following for up to 180 days each:
- Loss of canteen
- Loss of appliances (i.e., televisions, cassette players, CD players and radios)
- Loss of annual/quarterly packages
- Loss of telephone privileges
- Loss of personal property

*R. Kirkland*

RICHARD J. KIRKLAND
Warden (A)

State of California

# Memorandum

Date : October 8, 2004

To : Todos los Prisioneros

From : Department of Corrections
Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA 95531-7000

Subject : ADMINISTRACION DE INCIDENTES DE EXIBICIONISMO INDECENTE EN
PELICAN BAY STATE PRISON

La Prisión de Pelican Bay ha establecido un programa para administrar y reducir los casos de exhibicionismo indecente. El exhibicionismo indecente es un acto deliverado de exposición indecente de genitales y masturbación bajo circunstancias que pueden ofender o molestar a otra persona.

Bajo el presente programa todos los casos de Exhibicionismo o Conducta Desordenada son reportados y documentados. Este programa tambien incluye la aplicación de precauciones de seguridad para los prisioneros que cometen una ofensa de exhibicionismo indecente, seran segregados y consecuencias disciplinarias seran aplicadas a los prisioneros que sean culpables de violar las reglas con dichas ofensas, incluyendo la asignación al Fiscal del Distrito para ser llevado a un juicio criminal.

Este programa tambien provee evaluación de salud mental y en casos apropiados se ofrecerá tratamiento de salud mental para los prisioneros que cometan un acto de exposición indecente.

Las siguientes precauciones de seguridad estan siendo implementadas y pudieran ser aplicadas a los prisioneros que cometan estas ofensas.

## PRECAUCION DE SEGURIDAD
(Instituidas inmediatamente despues de cualquier acto de exhibicionismo indecente y revisadas periodicamente para determinar si es necesario continuar.)
- Covertura de la puerta y ventana de la celda con anuncio y color Amarillo brillante
- Uniforme para controlar el exhibicionismo
- Restricción de Yarda

Es anticipado que la Prisión De Pelican Bay recibirá la autorización en un futuro cercano para implementar un proyecto piloto que abordara el manejo de incidents de exhibicionismo indecente. Algunos de los componentes proyectados en este plan incluyen acciones de clasificación adversa, asi como pérdida de privilegios a través del proceso disciplinario.

Por ejemplo, bajo el proyecto piloto los prisioneros que sean culpables de cometer ofensas de exhibicionismo indecente serán sometidos a lo siguiente:

Todos los Prisioneros
Pagina 2


## CLASIFICACION

Primera ofensa de violación puede resultar en las siguientes acciones adversas de clasificación:

- Retención en segregación
- Asesoría para la aplicación de el sufijo "R"

## PERDIDA DE PRIVILEGIOS

La primera ofensa de violación puede resultar en en la pérdida de uno o todo lo siguiente por hasta 90 dias cada una. La Segunda ofensa de viloación puede resultar en la pérdia de uno o todo lo siguiente por hasta 180 dias cada una:

- Pérdida de canteen (tienda)
- Pérdida de aparatos electricos (ejemplo, televisiones, grabadoras, Cd players y radios)
- Pérdida al derecho de recibir paquetes anualmente y trimestralmente
- Pérdida de el privilegio para el uso del teléfono
- Pérdida de propiedad privada


*R. Kirkland*
RICHARD J. KIRKLAND
Warden (A)

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                    ARNOLD SCWARZENEGGER, Governor

**DEPARTMENT OF CORRECTIONS**
PELICAN BAY STATE PRISON
5905 LAKE EARL DRIVE
P. BOX 7000
.ESCENT CITY, CA  95532-7000



September 2, 2004

Mr. John Hagar
Special Master
Federal District Courthouse, Law Library - 18th Floor
450 Golden Gate
San Francisco, CA  94102

Dear Mr. Hagar:

DEANNA L. FREITAG V. CALIFORNIA DEPARTMENT OF CORRECTIONS

As you know, we submitted a notice to the inmates regarding the management of indecent exposure incidents (draft dated August 13, 2004). The notice was discussed at the 30-day meeting on August 26, 2004, and an agreement was made to revise it. Based on that agreement, enclosed is the revised draft dated August 27, 2004 for your review.

If you have any questions or need more information, please contact Susan Hernandez, Associate Governmental Program Analyst, at (707) 465-9176.

Sincerely,

*R. Kirkland*

RICHARD J. KIRKLAND
Warden (A)

Enclosure

cc:    Kathleen Keeshen
       Dennis Beaty
       Michael Jorgenson
       Steven Fama

State of California

# Memorandum                      DRAFT 8/27/04

Date      :

To        :  All Inmates

From      :  Department of Corrections
             Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA 95532-7000

Subject   :  **MANAGEMENT OF INDECENT EXPOSURE INCIDENTS AT PELICAN BAY STATE PRISON**

Pelican Bay State Prison has established a program to manage and reduce indecent exposure incidents. Indecent exposure is the deliberate and lewd exposure of genitals or masturbation, under circumstances likely to offend or annoy another person.

Under the current program, all Indecent Exposure/Disorderly Conduct incidents are reported and tracked. This program also includes the application of security precautions for inmates who commit an indecent exposure offense, segregated placement, and disciplinary consequences for inmates found guilty of rules violations for such offenses, including possible referral to the district attorney for formal criminal prosecution. This program also provides for mental health screening of inmates who engage in indecent exposure and, in appropriate cases, the offering of mental health treatment.

The following security precautions are currently being used and may be assessed to inmates committing these violations.

SECURITY PRECAUTIONS (Instituted immediately after any act of indecent exposure, reviewed periodically to determine continued necessity.)
- Bright yellow placard/lexan cell front and cell front window covering.
- Indecent Exposure Control Jumpsuit.
- Yard Restriction.

It is anticipated that Pelican Bay State Prison will receive authorization in the near future to implement a Pilot Project to address the management of Indecent Exposure incidents. Some of the projected components of this plan include adverse Classification action as well as increased privilege loss through the disciplinary process.

Inmates found guilty of committing Indecent Exposure offenses may be subject to the following:
_For example under the Pilot Project_
CLASSIFICATION:
First offense violation may result in the following adverse Classification actions:
- Retention in segregation.
- Assessment of an "R" Suffix.

PRIVILEGE LOSS
First offense violation may result in loss of any or all of the following for up to 90-days each. Second offense violations may result in loss of any or all of the following for up to 180-days each.
- Loss of canteen.
- Loss of appliances (i.e., televisions, cassette players, CD players and radios).
- Loss of annual/quarterly packages.
- Loss of telephone privileges.
- Loss of personal property.

RICHARD J. KIRKLAND
Warden (A)

# EXHIBIT G



BACK



FRONT

# EXHIBIT H

State of California

# Memorandum

ate : July 15, 2003

To : ALL PSU STAFF

From : Department of Corrections
Pelican Bay State Prison, P.O. Box 7000, Crescent City, CA. 95532-7000

Subject : YELLOW LEXAN

The yellow Lexan currently being installed in the Psychiatric Services Unit, Housing Units B1, B2, and B3, represents part of a Pilot Project being conducted on Habitual Indecent Exposure Inmates. The Indecent Exposure Jumpsuits are also part of the project. Please bear with us over the next few weeks. Any constructive suggestions and observations you can make will be greatly appreciated. It is recommended that you make your suggestions and observations in writing to your Sergeant.

C. M. PATTEN
Facility Captain (A)
Psychiatric Services Unit

